**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Finch Therapeutics Group, Inc., *et al.*,[1] | Case No. 26-10409 (XXX) |
| Debtors. | (*Joint Administration Requested*) |

**DECLARATION OF MATTHEW P. BLISCHAK, CHIEF EXECUTIVE
OFFICER, SECRETARY, AND PRESIDENT OF THE DEBTORS, IN SUPPORT OF
THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Matthew P. Blischak, hereby declare under penalty of perjury to the best of my knowledge, information, and belief:

1.      I am the Chief Executive Officer ("CEO") and Secretary of Finch Therapeutics Group, Inc., a corporation organized under the laws of Delaware ("FTG"), and the President and Secretary of Finch Therapeutics, Inc., a corporation organized under the laws of Delaware ("FTI"), Finch Therapeutics Holdings LLC, a limited liability company organized under the laws of Delaware ("Holdings"), and Finch Research and Development LLC, a limited liability company organized under the laws of Delaware ("FRD"), the above-captioned debtors and debtors in possession (collectively, the "Debtors").  On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "Court") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Finch Therapeutics Group, Inc. (3558); Finch Therapeutics, Inc. (3711); Finch Therapeutics Holdings LLC (0727); and Finch Research and Development LLC (9205).  The Debtors' service address is 75 State Street, Suite 100, Boston, MA 02109.

2.	I have served as President or CEO and Secretary, as applicable, of the Debtors since May 2023.  I hold a Bachelor of Science in Chemical Engineering from Case-Western Reserve University, a Master of Science in Biotechnology from Johns Hopkins University, and a Juris Doctorate from The American University Washington College of Law.  I have more than twenty years of experience as an executive in the life sciences industry where I have been involved in significant patent litigation, licensing, acquisition, and collaboration matters.

3.	In my capacity as CEO and President of the Debtors, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration (this "Declaration") (a) to assist the Court and parties in interest in understanding the corporate history of the Debtors (collectively, "Finch" or the "Company"), the Debtors' business operations, and the circumstances and events leading to the commencement of these chapter 11 cases, and (b) in support of the Debtors' chapter 11 petitions and first day motions filed contemporaneously herewith, which seek relief intended to avoid immediate and irreparable harm to the Debtors' estates and to preserve their value.  The first day motions also seek certain procedural relief that will facilitate the Debtors' orderly transition into chapter 11.

4.	Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations and financial affairs, or my opinions based upon my experience and knowledge and information I have reviewed or obtained from the Debtors.  The statements in this Declaration are accurate and correct to the best of my knowledge, information, and belief.  If called upon as a witness, I could and would testify competently to the facts set forth in this Declaration as set forth herein.

**PRELIMINARY STATEMENT**

5.     Founded in 2014, Finch was an early pioneer in the field of microbiome therapeutics, seeking to develop technology to restore microbiomes in the human body, which, in turn, would directly address the underlying causes of many diseases driven by such microbiome imbalances.  Finch's intellectual property portfolio includes over 160 U.S. and foreign patents and pending patent applications that are either owned by or exclusively licensed to the Company, encompassing both donor-derived and donor-independent microbiome therapeutics in a range of potential utilizations.   These patents are designed to target diseases linked to microbiome imbalances, including, for example, ulcerative colitis, Crohn's disease, and autism spectrum disorder.

6.     In January 2023, Finch announced its decision to discontinue its Phase III trial of CP101—an investigational, orally administered microbiome candidate designed for the treatment of recurrent *Clostridioides difficile* (commonly referred to as *C. diff*) ("CDI")—and to focus its business on realizing the value of the Company's intellectual portfolio through licensing partnerships and patent enforcement.  Finch wound down its development efforts following the discontinuation of the CP101 trial.

7.     As of the Petition Date, the Debtors are non-operating entities, and I am the Debtors' only remaining full-time employee.  The Company has no consistent revenue sources and has never generated any positive cash flow.  Its primary assets are its intellectual property portfolio, its library of existing research, and its contingent right to proceeds from a more than $25.0 million jury verdict entered in the Debtors' favor in August of 2024 against Ferring Pharmaceuticals Inc. and Rebiotix Inc., which verdict remains subject to post-trial motions and potential appeals.

8.      The Debtors filed these chapter 11 cases to maximize the value of their remaining assets for the benefit of all parties in interest through a marketing process and sale transaction pursuant to section 363 of the Bankruptcy Code (a "363 Sale").  Substantially contemporaneously herewith, the Debtors are filing a motion with this Court seeking approval of proposed bidding procedures to govern the 363 Sale process.

## BACKGROUND

9.      To assist the Court and parties in interest in understanding the Company's business and the relief the Debtors are seeking in the first day motions, this Declaration is organized as follows:

- *Part I* provides a general overview of the Company's corporate history and business operations;

- *Part II* describes the Debtors' pre-petition capital structure;

- *Part III* describes the circumstances leading to the filing of these chapter 11 cases; and

- *Part IV* discusses the first day motions.

## I.      CORPORATE HISTORY AND BUSINESS OPERATIONS

### A.      The Company's Corporate History

10.      FTI was founded in 2014 (originally as Finch Scientific, Inc.) to harness the genomic revolution and machine learning to pioneer microbiome therapeutics.  In September 2017, FTI merged with Crestovo Holdings, LLC ("Crestovo"), combining FTI's and Crestovo's respective microbiome platforms.  As a result of this merger, FTG was formed, and FTI and Crestovo became wholly owned subsidiaries of FTG.  In November 2020, Crestovo was renamed Holdings.  As of the Petition Date, FTG is the sole stockholder of FTI and the sole member of Holdings.  Holdings is the sole member of FRD.  A chart showing Finch's organizational structure is provided below:



## B.     The Company's Historical and Current Business Operations

11.     At its inception, Finch was created to harness the extraordinary potential of microbiome therapeutics to heal myriad diseases caused by microbiome imbalances plaguing countless individuals.  A microbiome consists of trillions of microbes that live symbiotically in and on every human.  By evolving together over millions of years, microbes and humans have developed an intricate and mutually beneficial relationship.  The microbiome is fundamentally intertwined with many aspects of human physiology, ranging from immune and metabolic functions to neurological function and reproductive health.  Disruption to the microbiome found in the human gut—where more than 70% of the body's immune cells are located—is associated with a larger number of diseases that have dramatically increased in prevalence among populations in developed countries over the past century.  Microbiome losses and disruption can increase a person's susceptibility to immune disorders, infections, neurological conditions, cancer, and other

serious diseases.  The goal of microbiome therapeutics is to restore the harmonious microbiome-human relationship, which in turn addresses the underlying causes of many diseases driven by disruption of the microbiome.

12.     Over the years, Finch worked on the development of multiple microbiome therapeutics focused primary on the concept of fecal microbiota transplantation ("FMT") between a healthy donor and a recipient to restore a balanced gut microbiome in the recipient.  The FMT process can, among other things, (a) restore balance by introducing thousands of beneficial microorganisms, (b) restore the metabolism of bile acids that inhibit unhealthy bacterial growth, and (c) otherwise stabilize an individual's microbial ecosystem.

13.     Microbiome therapeutics developed by Finch include: (a) FIN-524, designed for the prevention, diagnosis, theragnosis or treatment of diseases in humans, including ulcerative colitis; (b) FIN-525, for the treatment of Crohn's disease; (c) FIN-211, an investigational microbiome candidate designed to address the gastrointestinal and behavioral symptoms of autism spectrum disorder; and (d) CP101, an orally administered complete microbiome therapeutic designed for the treatment of recurrent CDI infections.  CDI remains one of the most common healthcare-associated infections, with more than 400,000 infections annually in the U.S. alone.

14.     The Company completed two successful clinical trials for CP101, and development of CP101 reached the Phase III trial stage, the final stage before a company can request approval from the Food and Drug Administration to market a new drug.  Unfortunately, multiple factors—including the Company's inability to secure additional capital or partnerships to help fund the CP101 program through important milestones, slower than anticipated enrollment of participants in the Phase III trial, the harmful impact of ongoing unauthorized use of Finch's intellectual property (*see Part III.A Unresolved Patent Litigation, infra*), and broader sector-wide trends—

together caused Finch to be unable to continue its pursuit of developing CP101 in recurrent CDI. On January 24, 2023, Finch announced its decision to discontinue its Phase III trial of CP101. As a result of this difficult decision, Finch wound down its development efforts and significantly scaled back its expenses, including by terminating vendor contracts and reducing its headcount to one full-time employee (me).

15.     Following the discontinuation of the development of CP101, Finch shifted its focus on realizing the value of its intellectual property and other assets through licensing its technology to collaboration partners, enforcing its patent rights against infringing parties and, in certain cases, generating additional data on selected product candidates through academic collaborations. In its pursuit of developing life transforming microbiome therapeutics over the years, Finch amassed a robust intellectual property portfolio, including over 160 U.S. and foreign patents and pending patent applications that are either owned by or exclusively licensed to Finch. Nearly 100 of those patents are directly owned by Finch with the remainder exclusively licensed from strategic partners, including academic institutions. The patents owned by or licensed to Finch have broad applicability of specific inventions across the microbiome field. Many of these patents and patent applications originate from patent families that embody pioneering work in the field of microbiome therapeutics.

## II.     THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE

16.     FTG is owned by its shareholders. FTG's common stock traded on the Nasdaq Global Select Market ("Nasdaq GSM") under the ticker symbol "FNCH" while the Company was actively researching and developing products. On February 16, 2024, however, Finch received a letter from the Listing Qualifications Department of The Nasdaq Stock Market LLC ("Nasdaq") informing Finch that FTG's common stock would be delisted from the Nasdaq GSM. Following

the delisting from the Nasdaq GSM, FTG's common stock began trading on over-the-counter markets operated by OTC Markets Group Inc.

17. In January 2023, Finch paid off all outstanding principal, accrued, and unpaid interest, fees, costs and expenses, equal to $16.2 million in the aggregate, under its then-existing Loan and Security Agreement, dated as of May 11, 2022, with Hercules Capital, Inc., as lender. All of Finch's obligations, covenants, debts and liabilities under the Loan and Security Agreement have been satisfied, and Finch has no other funded indebtedness under any other loan instrument as of the Petition Date.

18. As of the Petition Date, the Debtors have approximately $3.5 million of cash on hand, which they will utilize to fund these cases. The Debtors have no lines of credit, and they are not seeking debtor-in-possession financing.

## III. EVENTS LEADING TO THESE CHAPTER 11 CASES

19. These chapter 11 cases are being filed because of a number of issues and events that have affected the Debtors' performance and available liquidity in recent years. Accordingly, the Debtors have determined that seeking relief pursuant to chapter 11 of the Bankruptcy Code and continuing their efforts to implement a value-maximizing transaction in chapter 11 provides the best alternative for the Debtors and their stakeholders.

### A. Unresolved Patent Litigation

20. On December 1, 2021, Ferring Pharmaceuticals Inc. and Rebiotix Inc. (together, "Ferring") filed a complaint against the Debtors in the United States District Court for the District of Delaware (the "District Court"), initiating the case *Ferring Pharmaceuticals Inc. et al. v. Finch Therapeutics Group, Inc. et al.*, Case No. 21-1694-JLH (D. Del.) (the "Patent Litigation"). In its complaint, Ferring sought a declaratory judgment that Ferring had not infringed the Debtors' patent rights with respect to certain U.S. patents, and that such patents were invalid. The Debtors,

along with the Regents of the University of Minnesota ("UMN"),[2] filed multiple answers and counterclaims against Ferring, alleging that Ferring had infringed certain of the Debtors' and UMN's patent rights, including infringement of U.S. Patents owned by UMN and exclusively licensed to the Debtors, relating to fecal microbiota transplant technology and related methods. By the time of trial, the parties had narrowed the issues to a subset of asserted patent claims from two Finch-owned patents and one patent exclusively licensed to Finch from UMN.

21.     For several years, the Debtors dedicated a significant amount of their financial and management resources to pursuing and managing the Patent Litigation.  On August 9, 2024, after a five-day trial, a jury rendered a verdict in favor of Finch and UMN, determining that Ferring infringed all three patents at issue, and awarded Finch and UMN damages in the amount of $25.0 million and $815,061 in compensatory royalties for commercial sales of a particular microbiome-based therapy marketed by Ferring through the date of the trial.

22.     More than 18 months have passed since the jury verdict and the Debtors have yet to receive any proceeds from the Patent Litigation.  Following the jury verdict, both sides filed post-trial motions.  Ferring asked the District Court to issue a Judgment as a Matter of Law in its favor, and the Debtors and UMN requested enhanced damages, supplemental damages, ongoing royalty payments, and pre- and post-judgment interest.  The parties completed their briefing on post-trial motions by the end of 2024, but the District Court has yet to issue any ruling on those post-trial motions.  Given their cash position, the Debtors have simply run out of time to await the District Court's decision and to litigate any appeals that will likely follow.  Instead, the Debtors seek to monetize any proceeds from the litigation and the Debtors' intellectual property portfolio for distribution to stakeholders.

---

[2]     UMN is the owner of certain patents at issue in the Patent Litigation and exclusively licenses such patents to the Debtors pursuant to an Exclusive License Agreement, dated as of January 28, 2022 (as amended).

### B.      Lease Obligations

23.      On August 3, 2021, FTI, as tenant, entered into a lease agreement (the "Lease") with Hood Park, LLC ("Hood Park"), as landlord, for approximately 61,139 square feet of office space in the Charlestown neighborhood of Boston, Massachusetts (the "Leased Premises").  The Lease contains an initial 10-year term and is set to expire on December 31, 2031.  Fixed rent for the entire 10-year term totals approximately $51.6 million, with the initial annual base rent for the Leased Premised totaling approximately $4.5 million.  The Lease also requires Finch to pay additional rent for things such as taxes, operating expenses, and utilities (electricity, gas, water, and sewer).

24.      Finch initially sought to use the Leased Premises for office and laboratory space, but ultimately did not need the Leased Premises for this or any other purpose.  Since entering into the Lease, Finch has not used the Leased Premises to conduct any business, research, development, or other operations.

25.      To reduce costs, on July 15, 2022, the Finch and Galy Co. ("Galy") entered into a sublease with respect to approximately one-third of the Leased Premises, and on October 31, 2022, the Company and Genetix Biotherapeutics, Inc. (f/k/a Bluebird Bio, Inc.) ("Genetix") entered into a sublease for the remaining portion of the Leased Premises (together, the "Subleases").  The Subleases partially offset the Debtors' payment obligations under the Lease for a brief period of time, but the Subleases expired by their terms prior to the Petition Date and the Debtors are no longer receiving proceeds from the Subleases to offset their payment obligations under the Lease.  Galy ceased operating out of the Leased Premises in or around October 2025, and Genetix ceased operating out of the Leased Premises in or around December 2025.  Prior to entry into the Subleases, the costs of the Lease—for space that Finch does not need and has never used—were borne solely on the Company.  The Debtors stopped paying rent under the Lease in October 2025.

Hood Park delivered a notice of default to the Debtors on November 10, 2025, but has not yet taken any further action.

26.     The Leased Premises were not directly occupied by the Debtors prepetition, are not necessary for any of the Debtors' business operations and provide no benefit to the Debtors or their estates.  The Lease is burdensome and any ongoing costs associated therewith would constitute a waste of estate resources.  Accordingly, to preserve value for all stakeholders, the Debtors are filing a motion at the outset of these chapter 11 cases seeking to reject the Lease.

### C.     Prepetition Monetization Efforts

27.     As noted above, because of funding and other challenges, Finch made the difficult decision in January 2023 to discontinue the Phase III trial for CP101 that was in progress.  Finch then wound down its development efforts and significantly reduced employee headcount from more than 150 full-time employees to a single remaining full-time employee.

28.     In the fall of 2025, Finch engaged Ropes & Gray LLP ("Ropes") to provide advice regarding restructuring and go-forward options.  Around that same time, FTG appointed Stephen McCall to serve as an independent director to oversee the Company's efforts.  Around such time, Finch began negotiations with Hood Park in the hopes of reaching a consensual resolution for an early termination of the Lease.

29.     As these negotiations continued, Finch's financial position continued to worsen.  Finch had no consistent revenue stream and was incurring mounting operating costs, with no proceeds of the Patent Litigation flowing to the Company due to the post-trial motion practice and likelihood of additional appeals.  Due to the ongoing cash drain on Finch, its inability to generate cash flow, and an inability of Finch and Hood Park to agree on the terms of a settlement, Finch began to explore strategic alternatives to address its go-forward liquidity position.

30.     The Debtors evaluated their restructuring options and determined that an out-of-court transaction, which would require shareholder approval, was not feasible considering the Debtors' limited liquidity.   The Debtors need an efficient, cost-effective process to realize maximum value on their assets for the benefit of their stakeholders.   Accordingly, the Debtors ultimately determined that the best way to maximize value for all stakeholders would be through a sale process in chapter 11 involving the Debtors' remaining assets.   Such assets include (a) the Debtors' intellectual property portfolio consisting of over 160 issued patents and pending patent applications that are either owned by or exclusively licensed to Finch, encompassing both donor-derived and donor-independent microbiome therapeutics, together with any proceeds from actions to enforce such intellectual property rights, including but not limited to the Patent Litigation, and (b) a proprietary strain library consisting of microbial strains isolated by the Company, together with associated research data.

31.     In the weeks leading up to the Petition Date, Finch engaged Rock Creek Advisors, LLC ("Rock Creek") to serve as their sales agent in connection with the marketing and sale of the Debtors' assets.  Rock Creek has substantial experience in marketing the type of assets owned by the Debtors, including intellectual property rights for life sciences and litigation rights.  Lastly, in February 2026, Finch engaged Chipman Brown Cicero & Cole, LLP ("Chipman") to serve as co-counsel, along with Ropes, to assist the Debtors in navigating through these chapter 11 cases in an expeditious manner.

32.     Through these chapter 11 cases, the Debtors, with the assistance of Rock Creek and the Debtors' other advisors, are seeking to conduct a marketing and sale process with respect to the Company's assets and ultimately consummate a sale transaction with the bidder submitting the highest or otherwise best offer for such assets.  The Debtors are not presently seeking approval of

any postpetition financing and intend to utilize the Debtors' remaining cash on hand to facilitate the sale and chapter 11 process. The Debtors' liquidity is limited, however, so I believe an efficient, expeditious sale process is reasonable under the circumstances and will maximize value for the estates and all stakeholders.

33.     Since its engagement, Rock Creek has been working with the Debtors to gather diligence for a virtual data room, prepare its marketing materials, and compile a list of potentially interested parties, and is now actively seeking stalking horse bids to serve as a floor price for other potential bidders. I believe that the chapter 11 cases and marketing and sale process will enable the Debtors to obtain a value maximizing sale transaction that is in the best interest of the Debtors and their stakeholders.

## IV.     FIRST DAY MOTIONS AND RELATED RELIEF REQUESTED

34.     In connection with the filing of these chapter 11 petitions, the Debtors filed the below-listed motions (collectively, the "First Day Motions") requesting relief that the Debtors believe is necessary to enable them to administer their estates with minimal disruption and loss of value during these chapter 11 cases. The facts set forth in each of the First Day Motions are incorporated herein in their entirety.[3]

> **(i)     Administrative Motions:**
>
> (1)     Joint Administration Motion. *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief*;
>
> (2)     Omni Application. *Application of Debtors for Entry of an Order Authorizing and Approving the Appointment of Omni Agent Solutions, Inc. as Claims and Noticing Agent and Granting Related Relief*; and

---

[3]     Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

(3)    Creditor Matrix Motion. *Motion of Debtors for Entry of an Order (I) Authorizing Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor; (B) File a Consolifated List of Top Twenty (20) Largest Unsecured Creditors; and (C) Redact Certain Personal Identification Information of Natural Persons, (II) Modifying the Requirement to File a List of All Equity Holders; and (III) Granting Related Relief.*

**(ii)    Operational Motions:**

(4)    Cash Management Motion. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms, and (II) Granting Related Relief*;

(5)    Insurance Motion. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors To (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder, and (B) Renew, Supplement, Modify, or Purchase Insurance Coverage; and (II) Granting Related Relief*; and

(6)    Taxes Motion. *Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Pay Certain Prepetition Taxes and Related Obligations.*

35.    The First Day Motions request authority to, among other things, pay claims of certain taxing authorities and continue the Debtors' cash management system and other operations in the ordinary course of business to ensure minimal disruption of the Debtors' operations during these chapter 11 cases. For the avoidance of doubt, the Debtors request authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

36.    The Debtors have tailored their requests for immediate relief to those circumstances in which the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates. I believe an orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief described below could hinder the Debtors' operations and cause irreparable harm. Other requests for relief will be deferred for consideration at a later hearing.

14

37.     I have reviewed each of the First Day Motions and am familiar with the content and substance contained therein.  The facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on advisors and I can attest to such facts.  I believe the relief requested in each of the First Day Motions listed above (a) is critical to ensure the maximization of value of the Debtors' estates, (b) is essential to achieving a successful outcome in these chapter 11 cases, and (d) serves the best interests of the Debtors' estates and stakeholders.

38.     The Debtors are also filing at the outset of these chapter 11 cases (a) a motion seeking to reject the Lease (a "Lease Rejection Motion") and (b) a motion seeking approval of, among other things, marketing and bidding procedures in connection with a sale of substantially all of the Debtors' assets and, following the selection of a successful bidder, a sale of substantially all of the Debtors' assets (a "Bidding Procedures Motion").  I believe that the relief sought in the Lease Rejection Motion and Bidding Procedures Motion is appropriate under the circumstances and in the best interest of the Debtors' estates.

## CONCLUSION

39.     The Debtors' ultimate goal in these chapter 11 cases is to achieve a value-maximizing result for the Debtors' stakeholders through the sale or other transaction involving the Debtors' assets.  I believe that if the Court grants the relief requested by the First Day Motions, the prospect for achieving these objectives will be substantially enhanced.

*[Remainder of Page Left Intentionally Blank]*

15

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 22, 2026

*/s/ Matthew P. Blischak*

Matthew P. Blischak
Chief Executive Officer and Secretary, Finch Therapeutics Group, Inc.
President and Secretary, Finch Therapeutics, Inc.
President and Secretary, Finch Therapeutics Holdings LLC
President and Secretary, Finch Research and Development LLC

16