# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Finch Therapeutics Group, Inc., *et al.*,[1] | Case No. 26-10409 (LSS) |
| Debtors. | (Jointly Administered) |

**FIRST AMENDED COMBINED DISCLOSURE STATEMENT
AND JOINT CHAPTER 11 PLAN OF FINCH THERAPEUTICS
GROUP, INC. AND ITS DEBTOR AFFILIATES**

| **CHIPMAN BROWN CICERO & COLE, LLP** | **ROPES & GRAY LLP** |
|---|---|
| Robert A. Weber (No. 4013) | Cristine Pirro Schwarzman (admitted *pro hac vice*) |
| Hercules Plaza | Cameron J. Cavalier (admitted *pro hac vice*) |
| 1313 North Market Street, Suite 5400 | 1211 Avenue of the Americas |
| Wilmington, Delaware 19801 | New York, New York 10036 |
| Telephone: (302) 295-0191 | Telephone: (212) 596-9000 |
| E-mail: weber@chipmanbrown.com | E-mail: cristine.schwarzman@ropesgray.com |
| | cameron.cavalier@ropesgray.com |
| | |
| Daniel G. Egan (admitted *pro hac vice*) | Chris L. Dickerson (admitted *pro hac vice*) |
| 420 Lexington Avenue, Suite 442 | 191 North Wacker Drive, 32nd Floor |
| New York, New York 10170 | Chicago, Illinois 60606 |
| Telephone: (646) 741-5529 | Telephone: (312) 845-1200 |
| E-mail: egan@chipmanbrown.com | E-mail: chris.dickerson@ropesgray.com |

*Co-Counsel to the Debtors and Debtors in Possession*

Dated:    July 24, 2026
         Wilmington, Delaware

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Finch Therapeutics Group, Inc. (3558); Finch Therapeutics, Inc. (3711); Finch Therapeutics Holdings LLC (0727); and Finch Research and Development LLC (9205).  The Debtors' service address is 75 State Street, Suite 100, Boston, MA 02109.

**TABLE OF CONTENTS**

**Page**

ARTICLE I DEFINITIONS AND INTERPRETATION ................................................................1

    A.   Definitions................................................................................................1
    B.   Interpretation; Application of Definitions and Rules of Construction.............................16
    C.   Controlling Document. ..........................................................................17

ARTICLE II DISCLOSURES ...............................................................................................17

    A.   General Background of the Debtors ........................................................17
    B.   The Chapter 11 Cases ...........................................................................22
    C.   Overview of the Plan ............................................................................28

ARTICLE III CONFIRMATION AND VOTING PROCEDURES ...........................................30

    A.   Confirmation Procedures ......................................................................30
    B.   Procedures for Objections......................................................................30
    C.   Requirements for Confirmation ..............................................................31
    D.   Classification of Claims and Interests......................................................31
    E.   Unimpaired Claims and Impaired Claims or Interests................................33
    F.   Confirmation without Necessary Acceptances; Cramdown .........................33
    G.   Best Interests Test and Liquidation Analysis............................................34
    H.   Feasibility............................................................................................36
    I.   Eligibility to Vote on the Combined Disclosure Statement and Plan .............36
    J.   Solicitation Package / Release Opt-In.......................................................36
    K.   Voting Procedures, Voting Deadline, and Applicable Deadlines....................37
    L.   Alternatives to Confirmation and Consummation of the Plan.......................38
    M.   Risks and Other Considerations..............................................................39
    N.   No Duty to Update ................................................................................41

ARTICLE IV ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS, RESTRUCTURING EXPENSES, PRIORITY TAX CLAIMS, AND UNITED STATES TRUSTEE FEES ................41

    A.   Unclassified Claims ..............................................................................41
    B.   Administrative Claims ...........................................................................41
    C.   Professional Claims ..............................................................................43
    D.   Priority Tax Claims................................................................................44
    E.   Restructuring Expenses..........................................................................44
    F.   United States Trustee Fees......................................................................45

ARTICLE V CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.........45

    A.   Classification of Claims and Interests......................................................45
    B.   Summary of Classification......................................................................46
    C.   Special Provision Governing Unimpaired Claims......................................46
    D.   Subordinated Claims.............................................................................46
    E.   Treatment of Claims and Interests ..........................................................47
    F.   Voting Classes; Deemed Acceptance by Non-Voting Classes.......................50
    G.   Voting; Presumptions; Solicitation..........................................................50

H.  Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ..............................50
I.  Elimination of Vacant Classes .................................................................................51
J.  Separate Classification of Other Secured Claims ...................................................51
K.  Controversy Concerning Impairment .....................................................................51

ARTICLE VI MEANS FOR IMPLEMENTATION ...................................................................51
A.  Sale of Purchased Assets .........................................................................................51
B.  No Substantive Consolidation..................................................................................52
C.  Restructuring Transactions; Effectuating Documents .............................................52
D.  Sources of Consideration for Plan Distributions ....................................................53
E.  Plan Administrator....................................................................................................53
F.  Officers and Directors..............................................................................................55
G.  Wind Down and Dissolution of Liquidating Debtors..............................................55
H.  Implementation of the Plan......................................................................................56
I.  Corporate Existence .................................................................................................56
J.  Corporate Governance .............................................................................................57
K.  Vesting of Assets in the Liquidating Debtors and Plan Administrator.....................57
L.  Cancellation of Existing Documents and Instruments.............................................57
M.  Corporate Action......................................................................................................58
N.  Exemption From Certain Taxes and Fees ................................................................58
O.  Preservation of Causes of Action.............................................................................59
P.  Insurance Policies ....................................................................................................60
Q.  Indemnification of Directors, Managers, Officers, and Employees ........................61
R.  Closing of the Chapter 11 Cases .............................................................................61
S.  Retention of Books and Records..............................................................................61

ARTICLE VII DISTRIBUTIONS ...............................................................................................62
A.  Timing and Calculation of Amounts to Be Distributed...........................................62
B.  Delivery of Distributions and Undeliverable or Unclaimed Distributions .............63
C.  Withholding and Reporting Requirements; Compliance Matters.............................64
D.  Claims or Interests Paid or Payable by Third Parties .............................................65
E.  Setoffs and Recoupment ..........................................................................................66
F.  Foreign Currency Exchange Rate ............................................................................66

ARTICLE VIII PROCEDURES FOR DISPUTED CLAIMS AND INTERESTS ......................66
A.  Objections to Claims................................................................................................66
B.  Allowance of Claims; Settlement or Compromise ..................................................67
C.  Estimation of Claims................................................................................................67
D.  Elimination of Duplicate Claims .............................................................................67
E.  No Distributions Pending Allowance .......................................................................67
F.  Distributions After Allowance ..................................................................................68
G.  No Postpetition Interest............................................................................................68
H.  Resolution of Claims................................................................................................68
I.  Disputed Claims Reserve .........................................................................................68
J.  Disallowance of Claims and Interests......................................................................69
K.  Amendments to Claims and Late Filed Claims .......................................................69

L.    Single Satisfaction of Claims.................................................................................69

ARTICLE IX EXECUTORY CONTRACTS AND UNEXPIRED LEASES..............................70

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ......................70
B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases........................71
C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.....................72
D.    Assumption Dispute Resolution .....................................................................................72
E.    Pre-Existing Payment and Other Obligations..................................................................73
F.    Indemnification Obligations ...........................................................................................73
G.    Modifications, Amendments, Supplements, Restatements, or Other Agreements............73
H.    Reservation of Rights .....................................................................................................74

ARTICLE X SETTLEMENT, RELEASES, INJUNCTIONS, AND RELATED PROVISIONS 74

A.    Compromise and Settlement of Claims, Interests, and Controversies...............................74
B.    Release of Liens.............................................................................................................74
C.    Satisfaction of Claims and Termination of Interests........................................................74
D.    Term of Injunctions or Stays..........................................................................................75
E.    Releases by the Debtors .................................................................................................75
F.    Third Party Releases ......................................................................................................76
G.    Exculpation ...................................................................................................................77
H.    Injunction .....................................................................................................................78
I.    Securities and Exchange Commission ............................................................................79
J.    Protection Against Discriminatory Treatment .................................................................79

ARTICLE XI CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ..............................79

A.    Conditions Precedent to the Effective Date .....................................................................79
B.    Waiver of Conditions Precedent .....................................................................................81
C.    Substantial Consummation .............................................................................................81
D.    Effect of Vacatur of Confirmation Order.........................................................................81

ARTICLE XII RETENTION OF JURISDICTION.....................................................................81

ARTICLE XIII MISCELLANEOUS PROVISIONS ..................................................................83

A.    Subordinated Claims......................................................................................................83
B.    Amendments ..................................................................................................................83
C.    Revocation or Withdrawal of the Plan.............................................................................84
D.    Severability of Plan Provisions Upon Confirmation ........................................................84
E.    Votes Solicited in Good Faith.........................................................................................84
F.    Governing Law ..............................................................................................................85
G.    Time ..............................................................................................................................85
H.    Reference to Monetary Figures.......................................................................................85
I.    Additional Documents ...................................................................................................85
J.    Immediate Binding Effect...............................................................................................85
K.    Successors and Assigns...................................................................................................85
L.    Entire Agreement ..........................................................................................................85
M.    Notices ..........................................................................................................................86

ARTICLE XIV CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................................................................................................................87

    A.   Consequences to the Debtors ................................................................................88
    B.   Consequences to U.S. Holders of Allowed FTG Equity Interests ......................89
    C.   Matters Related to the Disputed Claims Reserve ...............................................89
    D.   Information Reporting and Backup Withholding ................................................90
    E.   Exemption from Certain Taxes ...........................................................................90
    F.   Importance of Obtaining Professional Tax Assistance .......................................90

ARTICLE XV RECOMMENDATION AND CONCLUSION .....................................................90


EXHIBIT A: Ferring APA
EXHIBIT B: Liquidation Analysis

**DISCLAIMER**

THIS COMBINED DISCLOSURE STATEMENT AND PLAN SUMMARIZES CERTAIN STATUTORY PROVISIONS, DESCRIBES CERTAIN EVENTS IN THESE CHAPTER 11 CASES, AND REFERENCES CERTAIN DOCUMENTS THAT MAY BE ATTACHED OR INCORPORATED BY REFERENCE.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES AND DESCRIPTIONS ARE FAIR AND ACCURATE, THEY ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE FULL TEXT OF SUCH DOCUMENTS, STATUTORY PROVISIONS, AND UNDERLYING EVENTS.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN EXCEPT AS EXPRESSLY INDICATED HEREIN.  THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF.

THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1123, 1125, AND 1129 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS.  THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION, NOR HAS THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. NO OTHER GOVERNMENTAL OR OTHER REGULATORY AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.  CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED.  THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR

1

CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

## INTRODUCTION[2]

The Debtors hereby jointly propose this Combined Disclosure Statement and Plan[3] pursuant to sections 1125 and 1129 of the Bankruptcy Code and Local Rule 3017-2.  The Debtors are the "proponents" of this Combined Disclosure Statement and Plan within the meaning of section 1129 of the Bankruptcy Code.

Copies of this Combined Disclosure Statement and Plan and all other documents filed with the Bankruptcy Court in these Chapter 11 Cases are available for review without charge on the bankruptcy case website at: https://omniagentsolutions.com/FinchTherapeutics.

This Combined Disclosure Statement and Plan contains, among other things, a discussion of the Debtors' history, business, assets, events leading up to these Chapter 11 Cases, treatment under this Combined Disclosure Statement and Plan, and other related matters.  The Debtors urge all Holders of FTG Equity Interests entitled to vote on this Combined Disclosure Statement and Plan to review this Combined Disclosure Statement and Plan in full before voting to accept or reject this Combined Disclosure Statement and Plan.  There may be other agreements and documents that will be filed with the Bankruptcy Court that are referenced in this Combined Disclosure Statement and Plan and the Plan Supplement.  All such agreements and documents are incorporated into and are a part of this Combined Disclosure Statement and Plan as if set forth in full herein.

Subject to the restrictions on modifications as set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and in this Combined Disclosure Statement and Plan, the Debtors expressly reserve the right to alter, amend, or modify this Combined Disclosure Statement and Plan one or more times before its substantial consummation.

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

**A.      Definitions**

1.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b) (including 503(b)(9)), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date to preserve the Estates and operate the Debtors' businesses; and (b) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

2.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which (i) with respect to Administrative Claims other than (a) Professional Claims, (b) Administrative Claims that have been Allowed on or before the Effective Date, (c) Section 503(b)(9) Claims, (d) Administrative Claims arising in the ordinary

---

[2]    Capitalized terms not defined in this Introduction shall have the meanings ascribed below.

[3]    The chapter 11 plan portion of this Combined Disclosure Statement and Plan is referred to as the "Plan" and the disclosure statement portion of this Combined Disclosure Statement and Plan is referred to as the "Disclosure Statement."

1

course of business out of the employment by one or more Debtors of an individual from and after the Petition Date, and (e) Administrative Claims held by the United States Trustee, shall be the first Business Day that is thirty (30) days after the Effective Date; and (ii) with respect to Section 503(b)(9) Claims, was the General Bar Date.

3.        "***Administrative Claims Objection Deadline***" means the final deadline for objecting to an Administrative Claim, which shall be on the date that is the later of (i) 180 days after the Effective Date or (ii) such other date as may be set by the Bankruptcy Court.

4.        "***Affiliate***" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

5.        "***Allowed***" means, with reference to any Claim or Interest, or any portion thereof, a Claim or Interest: (i) arising on or before the Effective Date as to which (A) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (B) any objection has been determined in favor of the Holder of the Claim or Interest by a Final Order; (ii) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, in accordance with the terms of the Plan and the Confirmation Order; (iii) as to which the liability of the Debtors or Liquidating Debtors, as applicable, and the amount thereof are determined by a Final Order; (iv) that is listed in the Schedules as liquidated, non-contingent, and undisputed, and is not superseded by a Proof of Claim; or (v) expressly allowed by the Plan; *provided, however*, that, notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to, and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, shall retain all claims and defenses with respect to Allowed Claims that are Unimpaired pursuant to the Plan; *provided, further*, that any Claim or Interest listed in the Schedules that has been paid by the Debtors (x) after the Petition Date pursuant to an order of the Bankruptcy Court, or (y) before the Petition Date and was inadvertently listed in the Schedules shall not be considered an Allowed Claim. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors, Liquidating Debtors, or Plan Administrator and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. For the avoidance of doubt, a Proof of Claim Filed after the applicable Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow," "Allowance," and "Allowing" shall have correlative meanings.

6.        "***Amended Schedules Bar Date***" has the meaning set forth in Article II.B.5 hereof.

2

7.     "***Anticipated Effective Date***" means the date the Debtors anticipate in good faith will be the Effective Date of the Plan.

8.     "***Assigned Executory Contracts and Unexpired Leases***" means those Executory Contracts and Unexpired Leases that are to be assumed and assigned by the applicable Debtor to the Ferring Purchaser or its designee pursuant to and as set forth in the Ferring APA, any other applicable Sale Transaction Documents, the Plan, or the Confirmation Order.

9.     "***Assets***" means all or substantially all of the Debtors' rights, title, and interests in and to property of whatever type or nature (including real, personal, mixed, intellectual, tangible, and intangible property).

10.     "***Auction***" has the meaning set forth in the Bidding Procedures.

11.     "***Assumption Dispute***" means an unresolved objection regarding assumption, assignment, Cure Claim disputes, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or other issues relating to assumption or assignment of an Executory Contract or Unexpired Lease.

12.     "***Assumed Liabilities***" has the meaning set forth in the Sale Transaction Documents.

13.     "***Available Cash***" means the amount of the net Sale Proceeds together with any additional Cash on hand of the Debtors as of the Effective Date, *less* all amounts (a) necessary to pay Holders of Allowed Administrative Claims, Allowed Professional Claims, Allowed Priority Tax Claims, Allowed Restructuring Expenses, Quarterly Fees, Allowed Other Secured Claims, Allowed Other Priority Claims, and Allowed General Unsecured Claims in accordance with the Plan, (b) estimated and reserved by the Debtors, Liquidating Debtors,  or Plan Administrator, as applicable, to adequately fund the reasonable and necessary projected costs and expenses to carry out the provisions of the Plan with respect to each Debtor or Liquidating Debtor on and after the Effective Date, including to wind-down the Debtors, Liquidating Debtors, and the Estates, (c) required to pay all fees payable under section 1930 of chapter 123 of title 28 of the United States Code, and/or (d) required to fund and maintain any reserve or escrow amounts under or in connection with the Plan, including the Professional Claims Escrow Account and any Disputed Claims Reserve.

14.     "***Avoidance Actions***" means any and all actual or potential avoidance, recovery, subordination, or other Causes of Action or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Causes of Action or remedies under sections 502, 510, 542, 544, 545, 547-553, and 724(a) of the Bankruptcy Code or under other similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

15.     "***Back-Up Bid***" has the meaning set forth in the Bidding Procedures.

16.     "***Back-Up Bidder***" has the meaning set forth in the Bidding Procedures.

17.     "***Bid Deadline***" has the meaning set forth in the Bidding Procedures.

18.    "***Ballot***" means the form distributed to each Holder of an Impaired Interest that is entitled to vote to accept or to reject this Plan, on which acceptance or rejection of this Plan is to be indicated.

19.    "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

20.    "***Bankruptcy Court***" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

21.    "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

22.    "***Bar Dates***" means the General Bar Date, the Governmental Bar Date, the Rejection Damages Bar Date, the Amended Schedules Bar Date, the Administrative Claims Bar Date, the Professional Claims Bar Date, and any other dates fixed by order(s) of the Bankruptcy Court (including the Bar Date Order, this Plan, or the Confirmation Order), by which any Persons asserting a Claim against any Debtor must have Filed a Proof of Claim or application for allowance of such Claim (as applicable) with the Bankruptcy Court against any such Debtor.

23.    "***Bar Date Motion***" means the *Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 3003(c)(3) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Administrative Expense Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and Approving the Form and Manner of Notice Thereof* [Docket No. 143], Filed on May 4, 2026.

24.    "***Bar Date Order***" means the *Order Pursuant to Bankruptcy Rule 3003(c)(3) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Administrative Expense Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and Approving the Form and Manner of Notice Thereof* [Docket No. 217], entered by the Bankruptcy Court on June 1, 2026.

25.    "***Bidding Procedures***" means the procedures attached as Exhibit 1 to the Bidding Procedures Order, as such procedures may be amended from time to time in accordance with the Bidding Procedures Order.

26.    "***Bidding Procedures and Sale Motion***" means the *Debtors' Motion Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code for Entry of (A) an Order (I) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (II) Scheduling Hearings and Objection Deadlines With Respect to the Sale, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Assumption and Assignment Procedures for Executory Contracts and Unexpired Leases, (VI) Authorizing the Debtors to Enter Into One or More Stalking Horse Agreements, and (VII) Granting Related Relief and (B) an Order (I) Approving the Sale of Substantially all of the Debtors' Assets Free and Clear*

4

*of Liens, Claims, Interests, and Encumbrances, (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases and (III) Granting Related Relief* [Docket No. 17], Filed on March 23, 2026.

27. "***Bidding Procedures Order***" means the *Order (I) Scheduling a Hearing to Consider Approval of the Sale of All or Substantially All of the Debtors' Assets and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, and (III) Granting Related Relief* [Docket No. 118], entered by the Bankruptcy Court on April 22, 2026.

28. "***Business Day***" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under United States Law.

29. "***Cash***" or "***$***" means legal tender of the United States of America and equivalents thereof, including bank deposits and checks.

30. "***Cause of Action***" means any claim, interest, damage, remedy, cause of action, demand, right, action, controversy, proceeding, agreement, suit, obligation, liability, account, defense, offset, power, privilege, license, lien, indemnity, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or indirectly, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  For the avoidance of doubt, Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.

31. "***CBCC***" means Chipman Brown Cicero & Cole, LLP.

32. "***Chapter 11 Cases***" means the jointly administered cases commenced under chapter 11 of the Bankruptcy Code styled *In re Finch Therapeutics Group, Inc.*, Case No. 26-10409 (LSS), pending before the Bankruptcy Court.

33. "***Claim***" has the meaning set forth in section 101(5) of the Bankruptcy Code.

34. "***Claims Agent***" means Omni in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

35. "***Claims Objection Deadline***" means the final deadline for objecting to a Claim other than an Administrative Claim, which shall be on the date that is 180 days after the Effective Date, subject to extension by the Bankruptcy Court upon a motion by the Liquidating Debtors or Plan Administrator; *provided, however*, that if the Liquidating Debtors or Plan Administrator Files such motion before the expiration of the then-effective Claims Objection Deadline, such Claims Objection Deadline shall be tolled pending entry of a further order by the Bankruptcy Court.

36.     "***Claims Register***" means the official register of Claims against and Interests in the Debtors maintained by the Claims Agent or the clerk of the Bankruptcy Court.

37.     "***Class***" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

38.     "***Combined Disclosure Statement and Plan***" means this combined disclosure statement and chapter 11 plan including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

39.     "***Conditional Approval and Solicitation Procedures Motion***" means the *Debtors' Motion for Entry of an Order (I) Approving Adequacy of Disclosures in Combined Disclosure Statement and Plan on Interim Basis, (II) Scheduling Confirmation Hearing and Objection Deadline, (III) Establishing Procedures for Solicitation and Tabulation of Votes, (IV) Approving Form of Ballots and Solicitation Package, and (V) Approving Notice,* [Docket No. 257], Filed on July 6, 2026.

40.     "***Conditional Approval and Solicitation Procedures Order***" means the *Order (I) Approving Adequacy of Disclosures in Combined Disclosure Statement and Plan on Interim Basis, (II) Scheduling Confirmation Hearing and Objection Deadline, (III) Establishing Procedures for Solicitation and Tabulation of Votes, (IV) Approving Form of Ballots and Solicitation Package, and (V) Approving Notice,* [Docket No. [●]], entered by the Bankruptcy Court on [●], 2026.

41.     "***Confirmation***" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

42.     "***Confirmation Date***" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

43.     "***Confirmation Hearing***" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

44.     "***Confirmation Order***" means the order of the Bankruptcy Court granting final approval of the Disclosure Statement and confirming the Plan under sections 1125 and 1129 of the Bankruptcy Code and approving the Sale Transaction pursuant to sections 363, 365, and 1123(b)(4) of the Bankruptcy Code in connection therewith.

45.     "***Consummation***" means the occurrence of the Effective Date.

46.     "***Creditor***" means any Person that is the Holder of a Claim against any Debtor.

47.     "***Crestovo***" means Crestovo Investor, LLC.

48.     "***Cure Claim***" means a monetary Claim in an amount, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or

6

Unexpired Lease) at the time such contract or lease is assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

49.    "***Cure Notice***" means the *Notice of Assumption, Assignment and Cure Amount with Respect to Executory Contracts and Unexpired Leases of the Debtors* [Docket No. 123], Filed on April 24, 2026.

50.    "***D&O Policy***" means all Insurance Policies (including any tail or run-off policy or endorsement) issued or providing coverage at any time, whether expired or unexpired, to any of the Debtors (and any of their predecessors) for certain liabilities of the Debtors and/or their current or former directors, managers, officers, and employees, and all agreements, amendments, modifications, endorsements, or other documents and instruments related thereto.

51.    "***District Court***" has the meaning set forth in Article II.A.3 hereof.

52.    "***District Court Judgment***" has the meaning set forth in Article II.A.3 hereof.

53.    "***Debtors***" means, collectively, (a) Finch Therapeutics Group, Inc., (b) Finch Therapeutics, Inc., (c) Finch Therapeutics Holdings LLC, and (d) Finch Research and Development LLC, each as debtors in possession in these Chapter 11 Cases.

54.    "***Definitive Documents***" means the definitive documents governing the transactions described herein, including, without limitation, the Sale Transaction Documents, the Plan, the Disclosure Statement, the Conditional Approval and Solicitation Procedures Motion, the Conditional Approval and Solicitation Procedures Order, the Confirmation Order, the Solicitation Packages, the Plan Supplement and the documents Filed in connection therewith, and any other documents or agreements executed, delivered, assumed, or performed to implement or supplement the Plan or the transactions described herein, each as may be amended, modified, or supplemented from time to time.  The Definitive Documents and any modifications thereto shall be in form and substance reasonably acceptable to the Debtors.

55.    "***Disallowed***" means a Claim against a Debtor, or any portion thereof, (i) that has been disallowed by a Final Order of the Bankruptcy Court, the Plan, or otherwise, (ii) that is listed in the Schedules at zero or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or applicable law, or (iii) that is not listed in the Debtors' Schedules and as to which a Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or under applicable law.

56.    "***Disclosure Statement***" means the disclosure statement portion of the Combined Disclosure Statement and Plan in accordance with, among other things, sections 1125 and 1126 of the Bankruptcy Code, including all exhibits, schedules, supplements, and annexes thereto, each as may be amended, supplemented, or otherwise modified from time to time.

57.    "***Disputed***" means any Claim against or Interest in a Debtor, or portion thereof, (a) to the extent neither Allowed nor Disallowed nor deemed Allowed under sections 502, 503, or

1111 of the Bankruptcy Code or this Plan, (b) for which a Proof of Claim or Interest or a motion for payment has been timely Filed with the Bankruptcy Court, to the extent the Debtors or any other party in interest has interposed a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, or the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order, or (c) is listed on the Schedules as unliquidated, disputed, and/or contingent for which no Proof of Claim in a liquidated and non-contingent amount has been Filed.

58. "*Disputed Claims Reserve*" means one or more reserves that may be established by the Plan Administrator created to reserve Cash for purposes of satisfying Disputed Claims pursuant to Article VIII of this Plan.

59. "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Liquidating Debtors or Plan Administrator on or after the Effective Date, upon which the Plan Administrator shall make distributions to Holders of Allowed Claims and Allowed Interests entitled to receive distributions under the Plan.

60. "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims and Allowed Interests against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date.

61. "*DTC*" means The Depository Trust Company.

62. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

63. "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

64. "*Exculpated Parties*" means, individually and collectively, and in each case in its capacity as such and solely to the extent they served in such capacity between the Petition Date and the Effective Date: (a) the Debtors and the Debtors' Professionals; and (b) each Debtor's officers, directors, managers, and members.

65. "*Executory Contract*" means a contract or agreement to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

66. "*Federal Judgment Rate*" means the federal judgment rate under 28 U.S.C. § 1961(a) in effect as of the Petition Date.

67. "*Ferring*" has the meaning set forth in Article II.A.3 hereof.

68. "*Ferring APA*" means the Asset Purchase Agreement by and among the Debtors and the Ferring Purchaser, as the same may be amended, modified, or otherwise supplemented, together with all schedules and exhibits thereto, a copy of which is attached hereto as **Exhibit A**.

69. "*Ferring Litigation Patents*" has the meaning set forth in Article II.A.3 hereof.

70.     "***Ferring Post-Trial Motion***" has the meaning set forth in Article II.A.3 hereof.

71.     "***Ferring Purchaser***" means Ferring Asset Holding LLC or any designee thereof (to the extent permitted under the Ferring APA) in its capacity as purchaser under the Ferring APA.

72.     "***File***," "***Filed***," or "***Filing***" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims Agent.

73.     "***Final Order***" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order.

74.     "***First Day Motions***" has the meaning set forth in Article II.B.1 hereof.

75.     "***Finch/UMN Post-Trial Motion***" has the meaning set forth in Article II.A.3 hereof.

76.     "***First Day Declaration***" means the *Declaration of Matthew P. Blischak, Chief Executive Officer, Secretary, and President of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 9], Filed with the Bankruptcy Court on March 22, 2026.

77.     "***FRD***" has the meaning set forth in Article II.A.3 hereof.

78.     "***FTG***" has the meaning set forth in Article II.A.3 hereof.

79.     "***FTG Equity Interest***" means an Interest in FTG.

80.     "***FTH***" has the meaning set forth in Article II.A.3 hereof.

81.     "***FTI***" has the meaning set forth in Article II.A.3 hereof.

82.     "***General Bar Date***" means June 29, 2026, at 5:00 p.m. (prevailing Eastern Time).

83.     "***General Unsecured Claim***" means any Claim against a Debtor that is not an Administrative Claim, a Professional Claim, a Priority Tax Claim, an Other Priority Claim, or an Other Secured Claim.

84.     "*Governmental Bar Date*" means September 18, 2026, at 5:00 p.m. (prevailing Eastern Time).

85.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

86.     "*Holder*" means a Person or an Entity holding a Claim against or an Interest in any Debtor.

87.     "*Impaired*" means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

88.     "*Indemnification Obligations*" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, or otherwise, for the directors, managers, and officers that are currently employed by, or serving on the board of directors of, any of the Debtors as of the date immediately prior to the Effective Date, and the employees, attorneys, accountants, investment bankers, and other professionals and agents that are currently employed by any of the Debtors as of the date immediately prior to the Effective Date, each of the foregoing solely in their capacity as such.

89.     "*Insurance Policy*" means each insurance policy, including the D&O Policies, issued or providing coverage at any time to any of the Debtors (or any of their predecessors) and all agreements, documents, or instruments relating thereto.

90.     "*Insured Claim*" means any Claim or portion of a Claim that is, or may be, insured under any of the Debtors' Insurance Policies.

91.     "*Insurer*" means any insurance company that issued or entered into any Insurance Policies, any third-party administrators of claims against the Debtors or asserted under the Insurance Policies, and any respective predecessors and/or affiliates thereof.

92.     "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

93.     "*Intercompany Interest*" means an Interest in any Debtor held by another Debtor.

94.     "*Interest*" means any common stock, limited liability company interest, or equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

95.     "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

96.    "*Lease*" has the meaning set forth in Article II.A.3 hereof.

97.    "*Leased Premises*" has the meaning set forth in Article II.A.3 hereof.

98.    "*Lease Rejection Motion*" has the meaning set forth in Article II.B.6 hereof.

99.    "*Lease Rejection Order*" has the meaning set forth in Article II.B.6 hereof.

100.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

101.    "*Liquidating Debtor*" means each Debtor and successors thereto after the Effective Date to be wound down, liquidated, and dissolved by the Plan Administrator in accordance with the Plan following the Effective Date.

102.    "*NOL Motion*" has the meaning set forth in Article II.B.7 hereof.

103.    "*Notice of Non-Voting Status*" has the meaning set forth in the Conditional Approval and Solicitation Procedures Order.

104.    "*Omni*" means Omni Agent Solutions, Inc.

105.    "*Opt-In Election Form*" has the meaning set forth in the Conditional Approval and Solicitation Procedures Order.

106.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

107.    "*Other Secured Claim*" means any Secured Claim that is not assumed by the Ferring Purchaser under the Sale Transaction Documents.

108.    "*Patent Litigation*" has the meaning set forth in Article II.A.3 hereof.

109.    "*Post-Trial Motions*" has the meaning set forth in Article II.A.3 hereof.

110.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

111.    "*Petition Date*" means March 22, 2026.

112.    "*Plan*" means the plan portion of this Combined Disclosure Statement and Plan Filed by the Debtors, as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto.

113.    "*Plan Administrator*" means the Person or Entity selected by the Debtors and to be disclosed in the Plan Supplement to serve as plan administrator and having the power, authority, and responsibility as set forth in the Plan Administrator Agreement and the Plan, including Article VI.E hereof.

11

114.   "*Plan Administrator Agreement*" means the agreement providing for the appointment pursuant to this Plan of the Plan Administrator to oversee the wind down, liquidation and dissolution of any Debtors, substantially in the form attached as an exhibit to the Plan Supplement.

115.   "*Plan Effective Date*" or "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) the Sale Transaction has been consummated in accordance with the Sale Transaction Documents, (b) all other conditions precedent under the Plan have been satisfied or waived by the Debtors in accordance with the Plan, and (c) the other Restructuring Transactions have been consummated.

116.   "*Plan Supplement*" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, each of which shall be Filed by the Debtors prior to the Confirmation Hearing, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, and which shall include, without limitation, the Plan Administrator Agreement, the Ferring APA, and the Schedule of Retained Causes of Action.

117.   "*Priority Tax Claims*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

118.   "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

119.   "*Professional*" means an Entity or Person employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

120.   "*Professional Claims*" means all fees and expenses (including but not limited to, transaction fees and success fees) for services rendered by Professionals in connection with the Chapter 11 Cases from the Petition Date through and including the Effective Date.

121.   "*Professional Claims Bar Date*" means forty-five (45) days after the Effective Date unless otherwise ordered by the Bankruptcy Court.

122.   "*Professional Claims Escrow Account*" means an escrow account funded by the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, with Cash no later than the Effective Date in an amount equal to the Professional Claims Escrow Amount.

123.   "*Professional Claims Escrow Amount*" means the aggregate amount of (a) Professional Claims for fees and expenses each Professional has incurred that will be unpaid as of the Effective Date and (b) fees and expenses each Professional estimates in good faith as of the Anticipated Effective Date that they will incur prior to and on the Effective Date.

124.   "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

125.   "*Purchased Assets*" has the meaning set forth in the Sale Transaction Documents.

126.   "*Qualified Bid*" has the meaning set forth in the Bidding Procedures.

127.   "*Qualified Bidder*" has the meaning set forth in the Bidding Procedures.

128.   "*Quarterly Fees*" has the meaning set forth in Article IV.F hereof.

129.   "*Reinstatement*" or "*Reinstated*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

130.   "*Rejection Damages Bar Date*" has the meaning set forth in Article II.B.5 hereof.

131.   "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 or 1123 of the Bankruptcy Code.

132.   "*Related Party*" means, with respect to any Person, collectively, its current and former directors, managers, officers, affiliated investment funds or investment vehicles, predecessors, participants, subsidiaries, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, successors and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

133.   "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor and Liquidating Debtor; (b) each Related Party of each Debtor and Liquidating Debtor; and (c) each Holder of an FTG Equity Interest, solely in its capacity as such, that affirmatively opts in to granting the releases contained in Article X.F hereof.

134.   "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Liquidating Debtor; (c) all Holders of Interests in Class 5 who check the box on its, his, or her Ballot indicating that it, he, or she opts to grant the releases contained in Article X.F hereof; (d) all Holders of Claims in Classes 1, 2, and 3 who timely return an Opt-In Election Form indicating that such Holder opts to grant the releases contained in Article X.F hereof; and (e) with respect to each of the foregoing Persons or Entities in clauses (a) through (d), their respective Related Parties.

135.   "*Restructuring Transactions*" means, collectively, the transactions contemplated by the Plan and Definitive Documents or that the Debtors reasonably determine are necessary or appropriate to implement the Plan, in accordance with the terms thereof, including the Sale Transaction.

136.    "*Restructuring*" means the restructuring transactions with respect to the Debtors, as contemplated by and described in the Plan and the Definitive Documents, which will be effectuated through the Restructuring Transactions.

137.    "*Restructuring Expenses*" means all reasonable and documented professional fees, expenses, and disbursements incurred by Crestovo in connection with these Chapter 11 Cases, from the Petition Date through the Effective Date, in an amount not to exceed $400,000 in the aggregate.

138.    "*Retained Causes of Action*" means the Causes of Action of the Debtors and their Estates set forth on the Schedule of Retained Causes of Action.

139.    "*Rock Creek*" means Rock Creek Advisors, LLC.

140.    "*Ropes & Gray*" means Ropes & Gray LLP.

141.    "*Sale Proceeds*" means all Cash and non-Cash proceeds of the Sale Transaction that the Debtors receive in accordance with the Sale Transaction Documents.

142.    "*Sale Transaction*" means the sale of all Purchased Assets to the Ferring Purchaser and assignment of all Assigned Executory Contracts and Unexpired Leases to the Ferring Purchaser pursuant to, and subject to the terms and conditions of, the Sale Transaction Documents.

143.    "*Sale Transaction Documents*" means the Ferring APA and all related documents, instruments, and agreements pursuant to which the Debtors will effectuate the Sale Transaction.

144.    "*Schedules*" means the schedules of assets and liabilities and the statements of financial affairs Filed by each of the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements may be further supplemented or amended from time to time.

145.    "*Schedule of Assumed and Retained Contracts and Leases*" means the schedule identifying the Executory Contracts and Unexpired Leases to be assumed by the Debtors or Liquidating Debtors under this Plan and that are not otherwise Assigned Executory Contracts and Unexpired Leases, and the Cure Claims associated with such Executory Contracts and Unexpired Leases, Filed as an exhibit to the Plan Supplement, which may be supplemented, amended, superseded or modified from time to time by the Debtors.

146.    "*Schedule of Retained Causes of Action*" means the schedule setting forth the Causes of Action of the Debtors and their estates that are not Purchased Assets and which will be transferred to the Liquidating Debtors as of the Effective Date, which shall include, without limitation, all Avoidance Actions that have not been settled, waived, and/or released as of the Effective Date to the extent not Purchased Assets under the Ferring APA and Sale Transaction Documents and which shall be filed as an exhibit to the Plan Supplement and which may be supplemented, amended, or modified from time to time by the Debtors.

147.    "*SEC*" means the United States Securities and Exchange Commission.

14

148.    "*Section 503(b)(9) Claims*" means Claims arising under section 503(b)(9) of the Bankruptcy Code.

149.    "*Secured*" means when referring to a Claim, a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

150.    "*Securities Act*" means the United States Securities Act of 1933, as amended and now in effect and as it may further be amended from time to time prior to the Effective Date.

151.    "*Security*" means a security as defined in Section 2(a)(1) of the Securities Act.

152.    "*Solicitation Packages*" has the meaning set forth in the Conditional Approval and Solicitation Procedures Order.

153.    "*Stay Relief Motion*" has the meaning set forth in Article II.B.8 hereof.

154.    "*Successful Bid*" has the meaning set forth in the Bidding Procedures.

155.    "*Successful Bidder*" has the meaning set forth in the Bidding Procedures.

156.    "*Tax Code*" means the Internal Revenue Code of 1986, as amended from time to time.

157.    "*Transfer*" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

158.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

159.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that, after the expiration of 365 days after the Effective Date, has not: (a) accepted such distribution; (b) given notice to the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, of an intent to accept such distribution; (c) responded to requests by the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, for information necessary to facilitate such distribution; or (d) taken any other action necessary to facilitate such distribution.

160.    "*UMN*" has the meaning set forth in Article II.A.3 hereof.

161.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

15

162.   "*United States Trustee*" means the United States Trustee for the District of Delaware.

163.   "*Voting Agent*" means Omni, who has been retained by the Debtors to perform, among other things, certain solicitation, tabulation, and other administrative services.

164.   "*Voting Deadline*" means August 24, 2026 at 4:00 p.m. (prevailing Eastern Time), in accordance with the Conditional Approval and Solicitation Procedures Order.

165.   "*Voting Record Date*" means the record date for purposes of determining which Holders of FTG Equity Interests in Class 5 are eligible to vote to accept or reject the Plan, which date shall be July 15, 2026.

**B.      Interpretation; Application of Definitions and Rules of Construction.**

The following rules of construction, interpretation, and application shall apply:

(a)   Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter genders.

(b)   Unless otherwise specified, each section, article, schedule, or exhibit reference in the Combined Disclosure Statement and Plan is to the respective section in, article of, schedule to, or exhibit to the Combined Disclosure Statement and Plan.

(c)   The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Combined Disclosure Statement and Plan as a whole and not to any particular section, subsection, or clause contained in the Combined Disclosure Statement and Plan.

(d)   The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Combined Disclosure Statement and Plan.

(e)   A term used herein that is not defined herein but that is used in the Bankruptcy Code shall have the meaning ascribed to that term in the Bankruptcy Code.

(f)   The headings in the Combined Disclosure Statement and Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Combined Disclosure Statement and Plan.

(g)   Unless otherwise provided, any reference in the Combined Disclosure Statement and Plan to an existing document, exhibit, or schedule means such document, exhibit, or schedule as may be amended, restated, revised, supplemented, superseded or otherwise modified from time to time.

16

(h)    In computing any period of time prescribed or allowed by the Combined Disclosure Statement and Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**C.    Controlling Document.**

The provisions of the Combined Disclosure Statement and Plan and the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided, however*, that, if there is determined to be any inconsistency between any Combined Disclosure Statement and Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Combined Disclosure Statement and Plan and shall control and take precedence.  In the event of an inconsistency between the Combined Disclosure Statement and Plan and any Definitive Document other than the Confirmation Order, the terms of the Combined Disclosure Statement and Plan shall control.

**ARTICLE II**
**DISCLOSURES**

On the Petition Date, the Debtors Filed their voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code initiating these Chapter 11 Cases.  After the Petition Date, the Debtors remained in possession of their assets and management of their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  Below is a summary of the Debtors' business and organizational structure, the events leading to the Debtors' Chapter 11 Cases, and certain key events in these Chapter 11 Cases.  Additional background with respect to the Debtors can be found in the First Day Declaration.

**A.    General Background of the Debtors**

1.    Corporate Structure and History of the Debtors

Finch Therapeutics, Inc. ("FTI") was founded in 2014 (originally as Finch Scientific, Inc.) as an early pioneer in the field of microbiome therapeutics.  FTI sought to develop technology to restore microbiomes in the human body, which, in turn, would directly address the underlying causes of many diseases driven by such microbiome imbalances.  In September 2017, FTI merged with Crestovo Holdings, LLC ("Crestovo Holdings"), combining FTI's and Crestovo Holdings' respective microbiome platforms.  As a result of this merger, Finch Therapeutics Group, Inc. ("FTG") was formed, and FTI and Crestovo Holdings became wholly owned subsidiaries of FTG. In November 2020, Crestovo Holdings was renamed Finch Therapeutics Holdings LLC ("FTH"). As of the Petition Date, FTG was the sole stockholder of FTI and the sole member of FTH.  FTH is the sole member of Finch Research and Development LLC ("FRD").

A chart showing the Debtors' organizational structure is provided below:



Each of the Debtors is organized under the laws of the State of Delaware.  FTG is owned by its shareholders.  FTG's common stock traded on the Nasdaq Global Select Market ("Nasdaq GSM") under the ticker symbol "FNCH" while the Debtors were actively researching and developing products.  On February 16, 2024, the Debtors received a notice from The Nasdaq Stock Market LLC ("Nasdaq") informing the Debtors that FTG's common stock would be delisted from the Nasdaq GSM.

Following the delisting from the Nasdaq GSM, FTG's common stock began trading on over-the-counter markets operated by OTC Markets Group Inc.  Approximately 1,605,763 shares of FTG common stock are outstanding, approximately 1,146,492 of which are beneficially owned through DTC.

At their inception, the Debtors were created to harness the potential of microbiome therapeutics to heal various diseases caused by microbiome imbalances plaguing countless individuals.  A microbiome consists of trillions of microbes that live symbiotically in and on every human.  By evolving together over millions of years, microbes and humans have developed an intricate and mutually beneficial relationship.  The microbiome is fundamentally intertwined with many aspects of human physiology, ranging from immune and metabolic functions to neurological function and reproductive health.  Disruption to the microbiome found in the human gut—where more than 70% of the body's immune cells are located—is associated with a larger number of diseases that have dramatically increased in prevalence among populations in developed countries over the past century.  Microbiome losses and disruption can increase a person's susceptibility to immune disorders, infections, neurological conditions, cancer, and other serious diseases.  The

18

goal of microbiome therapeutics is to restore the harmonious microbiome-human relationship, which in turn addresses the underlying causes of many diseases driven by disruption of the microbiome.

Over the years, the Debtors worked on the development of multiple microbiome therapeutics focused primarily on the concept of fecal microbiota transplantation ("FMT") between a healthy donor and a recipient to restore a balanced gut microbiome in the recipient. The FMT process can, among other things, (a) restore balance by introducing thousands of beneficial microorganisms, (b) restore the metabolism of bile acids that inhibit unhealthy bacterial growth, and (c) otherwise stabilize an individual's microbial ecosystem.

Microbiome therapeutics developed by the Debtors include: (a) FIN-524, designed for the prevention, diagnosis, theragnosis or treatment of diseases in humans, including ulcerative colitis; (b) FIN-525, for the treatment of Crohn's disease; (c) FIN-211, an investigational microbiome candidate designed to address the gastrointestinal and behavioral symptoms of autism spectrum disorder; and (d) CP101, an orally administered complete microbiome therapeutic designed for the treatment of recurrent CDI infections.

The Debtors completed two successful clinical trials for CP101, and development of CP101 reached the Phase III trial stage, the final stage before a company can request approval from the Food and Drug Administration to market a new drug. Unfortunately, multiple factors—including the Debtors' inability to secure additional capital or partnerships to help fund the CP101 program through important milestones, slower than anticipated enrollment of participants in the Phase III trial, the harmful impact of ongoing unauthorized use of the Debtors' intellectual property, and broader sector-wide trends—caused the Debtors to be unable to continue their pursuit of developing CP101 in recurrent CDI. On January 24, 2023, the Debtors announced their decision to discontinue their Phase III trial of CP101. As a result of this decision, the Debtors wound down their development efforts and significantly scaled back expenses, including by terminating vendor contracts and reducing their headcount to one full-time employee, and ultimately did not engage in any commercial sales of microbiome or other products to the market.

Following the discontinuation of the development of CP101, the Debtors shifted their focus on realizing the value of their intellectual property and other assets through licensing their technology to collaboration partners, enforcing their patent rights against infringing parties and, in certain cases, generating additional data on selected product candidates through academic collaborations. In their pursuit of developing microbiome therapeutics over the years, the Debtors built a robust intellectual property portfolio, including over 160 U.S. and foreign patents and pending patent applications that are either owned by or exclusively licensed to the Debtors. Nearly 100 of those patents are directly owned by the Debtors, with the remainder exclusively licensed from strategic partners, including academic institutions such as the Regents of the University of Minnesota ("UMN"). These patents are designed to target diseases linked to microbiome imbalances, including, for example, ulcerative colitis, Crohn's disease, and autism spectrum disorder.

2.      The Debtors' Prepetition Capital Structure

In January 2023, the Debtors paid off all outstanding principal, accrued, and unpaid interest, fees, costs and expenses, equal to $16.2 million in the aggregate, under their then-existing Loan and Security Agreement, dated as of May 11, 2022, with Hercules Capital, Inc., as lender. All of the Debtors' obligations, covenants, debts and liabilities under the Loan and Security Agreement have been satisfied.  The Debtors had no other funded or secured indebtedness under any other loan instrument as of the Petition Date.

The Debtors had approximately $3.5 million of cash on hand as of the Petition Date and have funded these Chapter 11 Cases from such cash on hand.  The Debtors have not entered into any debtor-in-possession financing facility in these Chapter 11 Cases.

3.      Significant Events Leading to the Chapter 11 Cases

The Debtors filed their Chapter 11 Cases because of a number of issues and events affecting the Debtors' performance and available liquidity in recent years.  The following summary of events is submitted for background purposes only and is not otherwise binding as factual findings on any party in interest.

(a)      Ferring Patent Litigation

On December 1, 2021, Ferring Pharmaceuticals Inc. and Rebiotix Inc. (together, "Ferring") filed a complaint against certain of the Debtors in the U.S. District Court for the District of Delaware (the "District Court"), initiating the case *Ferring Pharmaceuticals Inc. et al. v. Finch Therapeutics Group, Inc. et al.*, Case No. 21-1694-JLH (D. Del.) (the "Patent Litigation").  In its complaint, Ferring sought a declaratory judgment that (a) Ferring had not infringed the Debtors' patent rights with respect to certain U.S. patents, and (b) such patents were invalid.

The Debtors, along with UMN,[4] filed multiple answers and counterclaims against Ferring asserting, among other things, that Ferring had infringed certain of the Debtors' and UMN's patent rights with respect to U.S. patents owned by the Debtors and U.S. Patents owned by UMN and exclusively licensed to the Debtors relating to fecal microbiota transplant technology and related methods designed for the treatment of recurrent *Clostridioides difficile* (commonly referred to as *C. diff*).  By the time of trial, the parties had narrowed the issues to a subset of asserted patent claims relating to (a) two patents solely owned by FTH—U.S. Patent No. 10,675,309 and U.S. Patent No. 11,541,080—and (b) one patent exclusively licensed to FTH from UMN—U.S. Patent Nos. 10,251,914 (collectively, the "Ferring Litigation Patents").

On August 5, 2024, the case went to a jury trial in the District Court.  The trial involved a total of five (5) asserted patent claims relating to the three Ferring Litigation Patents owned by or exclusively licensed to the Debtors.  On August 9, 2024, after a five-day trial, the jury (a) rendered a verdict in favor of the Debtors and UMN, determining that Ferring infringed all three Ferring Litigation Patents at issue, (b) found that such infringement was willful, and (c) awarded the Debtors and UMN damages consisting of a $25 million upfront payment and $815,061 in

---

[4]      UMN is the owner of certain patents at issue in the Patent Litigation and exclusively licenses such patents to the Debtors pursuant to an Exclusive License Agreement, dated as of January 28, 2022 (as amended).

20

compensatory running royalties for commercial sales of a particular microbiome-based therapy marketed by Ferring through the date of the trial. On August 15, 2024, the District Court entered a *Judgment Following Jury Verdict* (the "District Court Judgment") ordering that a judgment in the amount of $25,815,061 be entered in favor of the Debtors and UMN and against Ferring, subject to potential modification following the District Court's consideration of post-trial motions that may be filed by the parties.

Following the jury verdict, both parties filed post-trial motions. Ferring filed a post-trial motion on September 12, 2024, asking the District Court to issue a judgment as a matter of law in its favor pursuant to Rule 50(b) of the Federal Rules of Civil Procedure (the "Ferring Post-Trial Motion"). The Debtors and UMN filed a post-trial motion that same day seeking, among other things, enhanced damages, supplemental damages, ongoing royalty payments, and pre- and post-judgment interest (the "Finch/UMN Post-Trial Motion" and, together with the Ferring Post-Trial Motion, the "Post-Trial Motions"). Briefing on the Post-Trial Motions was completed on December 3, 2024, but as of the Petition Date the District Court had yet to rule on the Post-Trial Motions and no proceeds from the Patent Litigation have been realized or paid to the Debtors. As discussed below, on June 10, 2026, the District Court issued a memorandum decision while these Chapter 11 Cases were pending upholding the jury's award of damages through the date of trial in the amount of $25,815,061 and granting the Debtors' request for ongoing royalties, pre- and post-judgment interest, and supplemental damages, and on July 2, 2026, the District Court entered a final judgment in favor of Finch/UMN and against Ferring for a total damages award of $29,505,816.72, plus ongoing royalties and post-judgment interest.

(b)     Prepetition Lease Obligations

On August 3, 2021, FTI, as tenant, entered into a lease agreement (the "Lease") with Hood Park, LLC ("Hood Park"), as landlord, for approximately 61,139 square feet of office space in the Charlestown neighborhood of Boston, Massachusetts (the "Leased Premises"). The Lease had an initial 10-year term that was set to expire on December 31, 2031. Fixed rent for the entire 10-year term totaled approximately $51.6 million, with the initial annual base rent for the Leased Premises totaling approximately $4.5 million. The Lease also required the Debtors to pay additional amounts for taxes, operating expenses, and utilities (electricity, gas, water, and sewer).

The Debtors initially sought to use the Leased Premises for office and laboratory space, but ultimately did not need the Leased Premises for this or any other purpose. The Debtors did not use the Leased Premises to conduct any business, research, development, or other operations.

To reduce costs, on July 15, 2022, the Debtors entered into a sublease with Galy Co. ("Galy") with respect to approximately one-third of the Leased Premises, and on October 31, 2022, the Debtors entered into a sublease with Genetix Biotherapeutics, Inc. (f/k/a Bluebird Bio, Inc.) ("Genetix") for the remaining portion of the Leased Premises (together, the "Subleases"). The Subleases partially offset the Debtors' payment obligations under the Lease for a brief period of time, but the Subleases expired by their terms prior to the Petition Date and the Debtors thereafter did not receive any proceeds from the Subleases to offset their payment obligations under the Lease. Galy ceased operating out of the Leased Premises in or around October 2025, and Genetix's Sublease expired by its terms in December 2025. Hood Park delivered a notice of default to the Debtors on November 10, 2025.

(c)     <u>Prepetition Monetization Efforts</u>

As noted above, because of funding and other challenges, the Debtors made the difficult decision in January 2023 to discontinue the Phase III trial for CP101 that was in progress. The Debtors then wound down their development efforts and significantly reduced employee headcount from more than 150 full-time employees to a single remaining full-time employee.

In the fall of 2025, the Debtors engaged Ropes & Gray to provide advice regarding restructuring and go-forward options. Around that same time, the Debtors (i) appointed Stephen McCall to serve as an independent director to oversee the Debtors' efforts and (ii) began negotiations with Hood Park in the hopes of reaching a consensual resolution for an early termination of the Lease.

As these negotiations continued, the Debtors' financial position continued to worsen. The Debtors had no consistent revenue stream and were incurring mounting operating costs, with no proceeds of the Patent Litigation flowing to them due to the post-trial motion practice and likelihood of additional appeals. Due to the ongoing cash drain on the Debtors, their inability to generate cash flow, and an inability of the Debtors and Hood Park to agree on the terms of a settlement, the Debtors began to explore additional strategic alternatives to address their go-forward liquidity position.

The Debtors evaluated their restructuring options, ultimately determining that the best way to maximize value for all stakeholders would be through a marketing process in chapter 11 involving the Debtors' remaining assets. Such assets include (a) the Debtors' intellectual property portfolio consisting of over 160 issued patents and pending patent applications that are either owned by or exclusively licensed to the Debtors, encompassing both donor-derived and donor-independent microbiome therapeutics, together with any proceeds from actions to enforce such intellectual property rights, including but not limited to the Patent Litigation, and (b) a proprietary strain library consisting of microbial strains isolated by the Company, together with associated research data.

In the weeks leading up to the Petition Date, the Debtors engaged Rock Creek to serve as their sales agent in connection with the marketing and sale of the Debtors' assets. In February 2026, the Debtors engaged CBCC to serve as co-counsel, along with Ropes & Gray, to assist the Debtors in navigating through the Chapter 11 Cases in a cost-effective and expeditious manner.

**B.     The Chapter 11 Cases**

1.    <u>First Day Motions and Orders</u>

On March 22, 2026, each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code commencing these Chapter 11 Cases. On and after the Petition Date, the Debtors filed a number of motions and applications seeking "first-day" relief (collectively, the "<u>First Day Motions</u>").[5] The relief obtained pursuant to the First Day Motions is set forth below:

---

[5] Capitalized terms used but not defined in this subsection have the meanings ascribed in the First Day Motions and Orders, as applicable.

22

- **Joint Administration Motion.**  Pursuant to the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 3] Filed on March 22, 2026, the Bankruptcy Court entered an order [Docket No. 27], among other things, directing the joint administration of the Debtors' Chapter 11 Cases for procedural purposes only.

- **Application to Retain Omni as Claims and Noticing Agent.**  Pursuant to the *Application of Debtors for Entry of an Order Authorizing and Approving the Appointment of Omni Agent Solutions, Inc. as Claims and Noticing Agent and Granting Related Relief* [Docket No. 4] Filed on March 22, 2026, the Bankruptcy Court entered an order [Docket No. 28], among other things, appointing Omni as the Debtors' claims and noticing agent with responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in these Chapter 11 Cases.

- **Consolidated List and Redaction Motion.**  Pursuant to the *Motion of Debtors for Entry of an Order (I) Authorizing Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor; (B) File a Consolidated List of Top Twenty (20) Largest Unsecured Creditors; and (C) Redact Certain Personal Identification Information of Natural Persons, (II) Modifying the Requirement to File a List of All Equity Holders; and (III) Granting Related Relief* [Docket No. 5] Filed on March 22, 2026, the Bankruptcy Court entered an order [Docket No. 29], among other things, authorizing the Debtors to file a consolidated creditor matrix and consolidated top twenty unsecured creditors list and redact certain personally identifiable information of individuals on such lists and other notices and documents filed in the Chapter 11 Cases.

- **Taxes Motion.**  Pursuant to the *Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Pay Certain Prepetition Taxes and Related Obligations* [Docket No. 6] Filed on March 22, 2026, the Bankruptcy Court entered interim and final orders [Docket Nos. 30 and 101, respectively], among other things, authorizing the Debtors to pay certain prepetition taxes, fees, and other related obligations owed to various taxing authorities.

- **Insurance Motion.**  Pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors To (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder, and (B) Renew, Supplement, Modify, or Purchase Insurance Coverage; and (II) Granting Related Relief* [Docket No. 7] Filed on March 22, 2026, the Bankruptcy Court entered interim and final orders [Docket Nos. 31 and 102, respectively], among other things, authorizing the Debtors to pay prepetition insurance obligations, continue paying premiums and other amounts due on insurance policies in the ordinary course, and renew,

23

supplement, modify, or purchase insurance coverage as needed during the Chapter 11 Cases in the Debtors' business judgment.

- **Cash Management Motion.** Pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms, and (II) Granting Related Relief* [Docket No. 8], Filed on March 22, 2026, the Bankruptcy Court entered interim and final orders [Docket Nos. 32 and 103, respectively], among other things, authorizing the Debtors to maintain their existing bank accounts, continue to operate their existing cash management system, and to honor and pay certain prepetition obligations relating thereto.

2.      Retention of Professionals

The Debtors have retained various professionals to advise and assist with the administration and prosecution of these Chapter 11 Cases. Such retained professionals include the following:

- **Ropes & Gray LLP.** On April 20, 2026, the Bankruptcy Court entered an order [Docket No. 110] authorizing the Debtors to retain Ropes & Gray as attorneys for the Debtors during these Chapter 11 Cases.

- **Chipman Brown Cicero & Cole, LLP.** On April 20, 2026, the Bankruptcy Court entered an order [Docket No. 106] authorizing the Debtors to retain CBCC as co-counsel for the Debtors during these Chapter 11 Cases.

- **Rock Creek Advisors, LLC.** On April 20, 2026, the Bankruptcy Court entered an order [Docket No. 107] authorizing the Debtors to retain Rock Creek to serve as the Debtors' financial advisor and sales agent during these Chapter 11 Cases.

- **Omni Agent Solutions, Inc.** On April 20, 2026, the Bankruptcy Court entered an order [Docket No. 109] authorizing the Debtors to retain Omni as administrative agent to the Debtors to provide certain administrative services falling outside the scope of 28 U.S.C. § 156(c).

- **BDO USA, P.C.** On May 5, 2026, the Bankruptcy Court entered an order [Docket No. 153] authorizing the Debtors to retain BDO USA, P.C. to provide certain tax advisory services to the Debtors.

On April 20, 2026, the Bankruptcy Court entered an order [Docket No. 100] establishing procedures for the interim compensation and reimbursement of expenses for the above-referenced professionals and any other professionals retained by the Debtors pursuant to 11 U.S.C. § 327 in connection with these Chapter 11 Cases.

24

Additionally, on April 20, 2026, the Bankruptcy Court entered an order [Docket No. 108] authorizing the Debtors to employ and pay certain professionals used by the Debtors in the ordinary course of the Debtors' business and operations, including: (i) Danforth Advisors, LLC for accounting and financial reporting advisory services; (ii) Gray, Gray & Gray, LLP for tax advisory services; (iii) Arnold & Porter Kaye Scholer LLP for intellectual property law matters; and (iv) Richards, Layton & Finger, P.A. for certain intellectual property litigation matters.

3.    No Committee Has Been Appointed in the Chapter 11 Cases

On April 1, 2026, the United States Trustee filed a *Statement that Unsecured Creditors Committee Has Not Been Appointed* [Docket No. 55] confirming that no unsecured creditors' committee has been appointed in these Chapter 11 Cases.

4.    Schedules, SOFAs, and Meeting of Creditors

Each of the Debtors filed its respective Schedules of Assets and Liabilities and Statements of Financial Affairs on April 6, 2026 [Docket Nos. 65 through 72]. Each of the Debtors subsequently amended certain of their respective Schedules on May 13, 2026 [Docket Nos. 173 through 176]. On April 23, 2026, the United States Trustee conducted and concluded the meeting of creditors pursuant to section 341(a) of the Bankruptcy Code [Docket No. 130].

5.    Bar Dates

On May 4, 2026, the Debtors filed the Bar Date Motion. Pursuant to the Bar Date Order entered on June 1, 2026 [Docket No. 217], the Bankruptcy Court established (i) the General Bar Date, (ii) the Governmental Bar Date, (iii) the later of (a) the General Bar Date and (b) twenty-five (25) days after the applicable claimant is served with an order approving the rejection of any Executory Contract or Unexpired Lease for the applicable contract or lease counterparty(ies) to file Rejection Damages Claims (the "Rejection Damages Bar Date"), and (iv) the later of (a) the General Bar Date and (b) twenty-five (25) days after notice of the applicable amendment to the Schedules for any entity affected by such amendment and who disputes such amendment to file a proof of claim or amend a previously filed proof of claim (the "Amended Schedules Bar Date").

The Debtors caused notice of the Bar Dates to be distributed broadly to all known Holders of potential Claims and various other parties in interest as set forth in more detail in the Bar Date Order. The Debtors also caused notice of the Bar Dates to be published on June 4, 2026 in *The Wall Street Journal* [Docket No. 225].

6.    Lease Rejection Motion

As discussed above, as of the Petition Date, Debtor FTI, as tenant, was party to a Lease with Hood Park for the Leased Premises located in the Charlestown neighborhood of Boston, Massachusetts. The Debtors were not occupying the Leased Premises as of the Petition Date or any time thereafter and such premises were not necessary for any ongoing operations of the Debtors. Accordingly, on the Petition Date, the Debtors filed a motion [Docket No. 10] (the "Lease Rejection Motion") seeking to reject the Lease and abandon any personal property that may be located at the Leased Premises effective as of the Petition Date.

25

Hood Park opposed the Lease Rejection Motion [Docket No. 132], arguing, among other things, that any rejection of the Lease should be effective as of the date on which the Bankruptcy Court enters an order approving the rejection (as opposed to such rejection being effective as of the Petition Date).  The Debtors responded to such objection and modified the requested effective date of rejection to be March 31, 2026 as opposed to March 22, 2026, because the Debtors had learned that Genetix had not fully vacated the Leased Premises by March 22, 2026 notwithstanding that the sublease between the Debtors and Genetix had expired by its terms in December 2025.

The Bankruptcy Court held a contested hearing on May 5, 2026 to consider the relief requested in the Lease Rejection Motion and, at the conclusion of that hearing, the Bankruptcy Court took the matter under advisement.  On May 26, 2026, the Bankruptcy Court issued a bench ruling granting the relief requested in the Lease Rejection Motion and approving the Debtors' rejection of the Lease effective as of March 31, 2026.  An order to that effect was entered by the Bankruptcy Court on May 27, 2026 [Docket No. 203] (the "Lease Rejection Order").  The Lease Rejection Order enabled the Debtors to realize significant savings on postpetition rent and other obligations with respect to the Lease.  Hood Park did not file any appeal from the Lease Rejection Order.

### 7. NOL Motion

On March 30, 2026, the Debtors filed a motion [Docket No. 42] (the "NOL Motion") seeking entry of interim and final orders establishing certain notice and objection procedures for certain transfers of equity securities in FTG designated to preserve the Debtors' net operating loss carryovers and other tax attributes.  On April 7, 2026, the Bankruptcy Court entered an order [Docket No. 77] granting the relief requested in the NOL Motion on an interim basis with modifications to certain of the notice timeframe requirements, and on May 1, 2026, the Bankruptcy Court entered an order [Docket No. 137] granting the relief requested in the NOL Motion on a final basis.

### 8. Stay Relief Motion

As discussed above, as of the Petition Date, the Debtors were continuing to await a ruling from the District Court on the Debtors' and Ferring's respective Post-Trial Motions in the Patent Litigation.  On April 3, 2026, the Debtors filed a motion [Docket No. 61] (the "Stay Relief Motion") with the Bankruptcy Court seeking limited relief from the automatic stay under 11 U.S.C. § 362, to the extent applicable, to allow the District Court to rule on the Post-Trial Motions.  The Debtors argued, among other things, that a District Court ruling on the Post-Trial Motions would benefit the Debtors' ongoing marketing process (described in more detail below) and provide potential transaction counterparties with greater clarity in evaluating the Debtors' assets, including the District Court Judgment, and in formulating a proposal for a sale or other restructuring transaction with respect to the Debtors and their assets.  On April 16, 2026, the Bankruptcy Court entered an order [Docket No. 89] granting the Stay Relief Motion.

On June 10, 2026, the District Court issued a memorandum opinion (a) denying Ferring's requests for judgment as a matter of law, (b) denying the Debtors' request for enhanced damages, and (c) upholding the jury's award of damages through the date of trial in the amount of $25,815,061 and granting the Debtors' request for ongoing royalties, pre- and post-judgment

interest, and supplemental damages.  On July 2, 2026, the District Court entered a final judgment in favor of Finch/UMN and against Ferring for a total damages award of $29,505,816.72, plus ongoing royalties and post-judgment interest.

9.        <u>Bidding Procedures and Sale Motion and Sale Process</u>

The Debtors' primary objective in these Chapter 11 Cases was to conduct a post-petition marketing process with the assistance of their advisors, including Rock Creek, for a sale or other restructuring transaction that would maximize value for all stakeholders.  Accordingly, on March 23, 2026, the Debtors filed the Bidding Procedures and Sale Motion seeking approval of, among other things, the Bidding Procedures in connection with a postpetition marketing process for a sale or other restructuring transaction involving the Debtors and their assets.  The Debtors made clear in the Bidding Procedures and Sale Motion that they were preserving flexibility with respect to the structure of a transaction and believed the Bidding Procedures would facilitate a thorough and cost-effective mechanism to realize the maximum value for the benefit of the Debtors' estates and stakeholders.

On April 22, 2026, the Bankruptcy Court entered the Bidding Procedures Order approving, among other things, the Bidding Procedures attached thereto.

Rock Creek contacted approximately 146 potential strategic and financial counterparties with respect to a potential transaction involving the Debtors and their assets, of which 20 parties executed non-disclosure agreements with the Debtors and received access to a virtual data room.

The original Bid Deadline and Auction date under the Bidding Procedures Order were May 28, 2026 and June 2, 2026, respectively.  The Debtors subsequently extended the Bid Deadline and Auction date to June 12, 2026 and June 15, 2026, respectively.  The Bidding Procedures also established a deadline for parties wishing to serve as a stalking horse bidder to submit a proposed stalking horse bid.  That deadline was originally scheduled for May 7, 2026, and the Debtors subsequently filed notices extending the stalking horse deadline to May 28, 2026.  The Debtors did not receive any viable stalking horse proposal prior to the stalking horse deadline and, accordingly, the Debtors did not designate a stalking horse bidder.

The Debtors did, however, receive multiple Qualified Bids as of the Bid Deadline, including, among other bids, a bid from the Ferring Purchaser for an all-cash purchase of substantially all of the Debtors' assets and a bid from Crestovo for a fully backstopped rights offering under a chapter 11 plan.  Accordingly, the Debtors commenced the Auction on June 15, 2026.  As of the end of day on June 15, 2026, the Ferring Purchaser and Crestovo continued to participate in the Auction and the Debtors had not yet designated a Successful Bidder.  In the exercise of their business judgment, the Debtors continued the Auction to June 18, 2026 to allow the remaining Qualified Bidders to continue bidding.  Additional continuations of the Auction were held on June 22, June 23, and June 24, 2026.

Prior to the conclusion of the Auction on June 24, 2026, the Debtors reached an agreement in principle with the Ferring Purchaser on the material terms of the Sale Transaction to be consummated through a chapter 11 plan, reflecting the Ferring Purchaser's $30 million cash bid placed at the Auction.  Crestovo did not submit any additional bid at the Auction after the Ferring

27

Purchaser submitted its $30 million cash bid and, in the exercise of the Debtors' reasonable business judgment, the Debtors determined that the Sale Transaction represented the highest or otherwise best offer for the Debtors' assets and designated the Ferring Purchaser as the Successful Bidder. In accordance with the Bidding Procedures, Crestovo was designated as the Back-Up Bidder. The Debtors designated (i) the Ferring Purchaser's bid as the Successful Bid and (ii) Crestovo's bid as the Back-Up Bid. The terms of Crestovo's Back-Up Bid provided for the Debtors, subject to Bankruptcy Court approval, to reimburse Crestovo for the Restructuring Expenses in the event the Debtors selected an alternative bid or proposal as the highest or otherwise best offer under the Bidding Procedures.

10.    Ferring Purchaser Sale Transaction

This Combined Disclosure Statement and Plan implements the Sale Transaction, the material terms of which provide for:

(a)    the Ferring Purchaser to acquire substantial assets of the Debtors, including various patents and other intellectual property rights owned by or licensed to the Debtors and the Debtors' rights with respect to the District Court Judgment and Patent Litigation but excluding certain other assets as identified in the Ferring APA;

(b)    the Debtors to assume and assign to the Ferring Purchaser the Assigned Executory Contracts and Unexpired Leases identified in the Ferring APA and other Sale Transaction Documents;

(c)    the Ferring Purchaser to pay the Debtors a cash purchase price of $30 million plus (i) payment by the Ferring Purchaser of all Cure Claims and (ii) the assumption by the Ferring Purchaser of certain liabilities identified in the Ferring APA and other Sale Transaction Documents; and

(d)    the Sale Transaction to be implemented and effectuated through this Combined Disclosure Statement and Plan and the Confirmation Order, with the closing of the Sale Transaction to occur following entry of the Confirmation Order; *provided*, *however*, that, pursuant to the Ferring APA, if the Plan has not been confirmed by September 1, 2026, the Ferring Purchaser may elect to seek entry of a sale order pursuant to section 363 of the Bankruptcy Code to consummate the Sale Transaction outside of the Plan.

## C.    Overview of the Plan

Each of the Debtors is a proponent of this Combined Disclosure Statement and Plan within the meaning of section 1129 of the Bankruptcy Code. The primary objective of this Combined Disclosure Statement and Plan and the transactions described herein is to maximize value for all stakeholders and generally to distribute all property of the Estates that is or becomes available for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Estates.

Generally speaking, this Combined Disclosure Statement and Plan:

- provides for the sale of substantially all of the Debtors' assets, other than Excluded Assets, to the Ferring Purchaser through the Sale Transaction and Ferring APA;

- places Claims against and Interests in the Debtors in particular Classes under the Plan;

- provides for payment in full or such other treatment as to render such Claims Unimpaired of Allowed Administrative Claims, Allowed Professional Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Other Priority Claims, and Allowed General Unsecured Claims from the net Sale Proceeds and Cash on hand of the Debtors as of the Effective Date;

- provides for any remaining net Sale Proceeds and other Cash on hand of the Debtors as of the Effective Date, after payment of the foregoing Allowed Claims and the establishment of a Disputed Claims Reserve, Professional Claims Escrow Account, and any other reserve or escrow authorized or permitted to be established in the Plan Administrator's discretion under the Plan, to be distributed *Pro Rata* to Holders of Allowed FTG Equity Interests;

- designates and appoints a Plan Administrator to, among other things, administer the Plan, reconcile Claims asserted against any Debtor, wind down the Debtors' remaining affairs and operations, and make distributions in accordance with the Combined Disclosure Statement and Plan to Holders of Allowed Claims and Interests to the extent set forth in the Plan; and

- provides for the rejection of any executory contracts and unexpired leases that are not assumed and assigned to the Ferring Purchaser in accordance with the Sale Transaction and Ferring APA and are not otherwise set forth in the Schedule of Assumed and Retained Contracts and Leases.

All Claims and Interests are placed in the Classes set forth below. The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation, and Distribution under the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

| Class | Claim or Interest | Treatment | Voting Status | Estimated Recovery |
|-------|-------------------|-----------|---------------|--------------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| Class 3 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |

| Class | Claim or Interest | Treatment | Voting Status | Estimated Recovery |
|-------|-------------------|-----------|---------------|--------------------|
| Class 4 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| Class 5 | FTG Equity Interests | Impaired | Entitled to Vote | *Pro Rata* share of Available Cash[6] |
| Class 6 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |

The Debtors believe that this Combined Disclosure Statement and Plan maximizes recoveries for all stakeholders in these Chapter 11 Cases.

## ARTICLE III
## CONFIRMATION AND VOTING PROCEDURES

### A.    Confirmation Procedures

The Conditional Approval and Solicitation Procedures Order, among other things, conditionally approves the Combined Disclosure Statement and Plan for solicitation purposes only and authorizes the Debtors to solicit votes to accept or reject the Combined Disclosure Statement and Plan.  The Confirmation Hearing has been scheduled for **September 1, 2026 at 10:00 a.m. (prevailing Eastern Time)** at the Bankruptcy Court, 6th Floor, Courtroom 2, 824 North Market Street, Wilmington, Delaware 19801 to consider (a) final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b)  confirmation of the Combined Disclosure Statement and Plan pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

### B.    Procedures for Objections

Any objection to final approval of the adequacy of disclosures in the Combined Disclosure Statement and Plan and confirmation of the Combined Disclosure Statement and Plan must be made in writing and filed with the Bankruptcy Court and served on (a) co-counsel to the Debtors, (i) Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 (Attn: Cristine Pirro Schwarzman       (cristine.schwarzman@ropesgray.com)       and       Cameron       J.       Cavalier

---

[6]    Approximately 1,605,763 shares of FTG common stock are outstanding.  A liquidation analysis is attached hereto as **Exhibit B** and estimates potential Distributions to Holders of Allowed Claims and Interests in a hypothetical Chapter 7 liquidation of all the Debtors' assets and compares such Distributions with the estimated recoveries under the Plan.  As set forth therein, the Debtors estimate that approximately $19 million, or approximately $11.83 per share, may be available for Distribution to Holders of FTG Equity Interests under the Plan.  Distributions to Holders of FTG Equity Interests are contingent upon consummation of the Sale Transaction and are based on good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution and may be reduced by, among other things, (i) the amount of Allowed Claims (including Administrative Claims, Professional Claims, Priority Tax Claims, Other Secured Claims, Other Priority Claims, and General Unsecured Claims), and (ii) unexpected costs incurred in the administration of the Plan.

(cameron.cavalier@ropesgray.com)) and (ii) Chipman Brown Cicero & Cole LLP, 1313 N. Market Street, Suite 5400, Wilmington, DE 19801 (Attn: Robert A. Weber (weber@chipmanbrown.com)) and Chipman Brown Cicero & Cole LLP, 420 Lexington Avenue, Suite 442, New York, NY 10170 (Attn: Daniel G. Egan (egan@chipmanbrown.com)); and (b) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lock Box 35, Wilmington, DE 19801 (Attn: Joseph McMahon (joseph.mcmahon@usdoj.gov)); in each case, by no later than **August 25, 2026 at 4:00 p.m. (prevailing Eastern Time)**. Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

**C.      Requirements for Confirmation**

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan (i) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (ii) must be feasible. The Bankruptcy Court must also find that the Plan: (i) has classified Claims and Interests in a permissible manner; (ii) complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (iii) has been proposed in good faith.

**D.      Classification of Claims and Interests**

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Combined Disclosure Statement and Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Debtors also are required, pursuant to section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Combined Disclosure Statement and Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Combined Disclosure Statement and Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them thereunder.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest also is placed in a particular Class for the purpose of receiving distributions pursuant to this Combined Disclosure Statement and Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that this Combined Disclosure Statement and Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for this Combined Disclosure Statement and Plan to be confirmed.  If such a situation develops, the Debtors intend, in accordance with the terms of this Combined Disclosure Statement and Plan, to make such permissible modifications to this Combined Disclosure Statement and Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect Holders of Claims or Interests by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of this Combined Disclosure Statement and Plan.

**EXCEPT AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY AND ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM OR INTEREST AND REQUIRES RESOLICITATION, ACCEPTANCE OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN BY ANY HOLDER OF AN FTG EQUITY INTEREST PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THIS COMBINED DISCLOSURE STATEMENT AND PLAN'S TREATMENT OF SUCH HOLDER'S INTERESTS REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

Because all Classes of Claims under this Combined Disclosure Statement and Plan are Unimpaired and entitled to payment in full, variations in the estimated versus ultimately Allowed amounts of such Claims will not affect the recovery of Holders of Allowed Claims.  However, the amount of any FTG Equity Interest that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Interest and, accordingly, the total Interests that are ultimately Allowed by the Bankruptcy Court with respect to the Impaired Class of FTG Equity Interests may also vary from any estimates contained herein.  Thus, the actual recovery ultimately received by a particular Holder of an Allowed FTG Equity Interest may be adversely or favorably affected by the aggregate amount of Allowed FTG Equity Interests, as distributions to Holders of Allowed FTG Equity Interests will be made Pro Rata from Available Cash after all Allowed Claims are paid in full.  Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by Holders of Allowed FTG Equity Interests.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized herein.  The Debtors believe that the consideration provided under the Combined Disclosure Statement and Plan to Holders of Claims (i.e., payment in full) and the consideration, if any, provided to Holders of Interests reflects an appropriate resolution of their Claims and Interests taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests.  The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Combined Disclosure Statement and Plan.  Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Combined Disclosure Statement and Plan, or do not

vote to accept the Combined Disclosure Statement and Plan, but who will be bound by the provisions of the Combined Disclosure Statement and Plan if it is confirmed by the Bankruptcy Court.

**E.      Unimpaired Claims and Impaired Claims or Interests**

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan.  Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan.  In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Combined Disclosure Statement and Plan, Holders of Claims in Class 1, Class 2, Class 3, and Class 4 are Unimpaired and, therefore, not entitled to vote on the Combined Disclosure Statement and Plan and are deemed to accept the Combined Disclosure Statement and Plan.  Holders of Intercompany Interests in Class 6 are Impaired and deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of FTG Equity Interests in Class 5 are Impaired and entitled to vote on the Plan.

**ACCORDINGLY, BALLOTS FOR ACCEPTANCE OR REJECTION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ARE BEING PROVIDED TO HOLDERS OF FTG EQUITY INTERESTS IN CLASS 5.**

**F.      Confirmation without Necessary Acceptances; Cramdown**

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  Under section 1129(a)(10) of the Bankruptcy Code, a plan may be confirmed, even if it is not accepted by all impaired classes of claims (as opposed to interests), if the plan has been accepted by at least one impaired class of claims (if any), and the plan meets the "cramdown" requirements set forth in section 1129(b)(2)(A) or (b)(2)(B) of the Bankruptcy Code, as applicable.  Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.  In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.  Here, Holders of Intercompany Interests in Class 6 are Impaired and such class is deemed to reject the Combined Disclosure Statement and Plan under section 1126(g) of the Bankruptcy Code.  Accordingly, the Debtors will seek confirmation of the Combined Disclosure Statement and Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  The Debtors believe that such requirements are satisfied, because no Holder of a Claim or Interest junior to those in Class 5 is entitled to receive any property under the Combined Disclosure Statement and Plan.  Additionally, the Debtors submit that section 1129(a)(10)'s requirement that a plan have at least one impaired accepting class

33

of claims (as opposed to interests) does not apply to the Combined Disclosure Statement and Plan because all Classes of Claims are Unimpaired hereunder.

The concept of "unfair discrimination" is not defined in the Bankruptcy Code, but has been suggested in recent case law to arise when a difference in a plan's treatment of two classes of equal priority results in a materially lower percentage recovery for the non-accepting class. Based upon their understanding of existing case law, the Debtors do not believe that the Plan unfairly discriminates against any Class of Claims. The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity Holders, as follows:

(a) Secured Creditors. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b) Unsecured Creditors. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the Holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c) Interests. Either (i) each Holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled or the value of the interest or (ii) the Holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the distributions provided under the Combined Disclosure Statement and Plan satisfy the absolute priority rule, where required.

**G.    Best Interests Test and Liquidation Analysis**

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the Combined Disclosure Statement and Plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the Combined Disclosure Statement and Plan or that the Combined Disclosure Statement and Plan will provide a member who has not accepted the Combined Disclosure Statement and Plan with a recovery of property of a value, as of the Effective

34

Date, that is not less than the amount that such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. A liquidation analysis is attached hereto as **Exhibit B**.

To calculate the probable distribution to Holders of each Impaired Class of Claims and Interests if the Debtors were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from the Debtors' Assets if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the Combined Disclosure Statement and Plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the Combined Disclosure Statement and Plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

As set forth in the annexed liquidation analysis, the Debtors believe that all Holders of Impaired Claims and Interests will receive property with a value not less than the value such Holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The primary Restructuring Transaction under the Plan is the Sale Transaction to the Ferring Purchaser on the terms and conditions set forth in the Ferring APA and other Sale Transaction Documents. The Debtors' agreement with the Ferring Purchaser on the terms and conditions of the Sale Transaction was reached only after an extensive post-petition marketing process conducted by the Debtors and their advisors during the Chapter 11 Cases in accordance with the Bidding Procedures and competitive bidding with more than one qualified bidder during a multi-day auction. From the anticipated net proceeds of the Sale Transaction to be effectuated under the Plan and additional cash on hand of the Debtors as of the Effective Date, Holders of all Allowed Administrative Claims, Allowed Professional Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Other Priority Claims, and Allowed General Unsecured Claims are expected to receive a 100% recovery under the Plan on account of their applicable Claim and, therefore, are Unimpaired. The Debtors also anticipate that, after satisfying the foregoing Allowed Claims, additional funds will be available to provide a cash distribution to Holders of FTG Equity Interests.

Distributions to Holders of FTG Equity Interests are contingent upon consummation of the Sale Transaction and may be reduced by, among other things, (i) the amount of Allowed Claims (including Administrative Claims, Professional Claims, Priority Tax Claims, and General Unsecured Claims), (ii) unanticipated Claims or litigation against the Estates, and (iii) unexpected costs incurred in the administration of the Plan.

The Debtors believe the Plan provides a greater recovery to Holders of Claims and Interests than such Holders would receive in a chapter 7 liquidation. In a chapter 7 liquidation, (i) conversion of the Chapter 11 Cases to chapter 7 would constitute a termination right under the Ferring APA, and there can be no assurance that the Ferring Purchaser would agree to consummate the Sale Transaction following such conversion; (ii) the delay of a chapter 7 trustee becoming familiar with the Debtors' assets, reinitiating a marketing process, and renegotiating the terms and conditions of the applicable sale documents would significantly delay any potential sale transaction and would likely result in a decreased purchase price for the Debtors' assets; (iii) the

purchase price ultimately received by the Debtors in chapter 7 could be materially lower than the purchase price currently contemplated by the Ferring APA; and (iv) the Estates would incur additional costs and expenses, including the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee, which the Debtors believe would exceed the expenses that would be incurred in implementing the Combined Disclosure Statement and Plan. Conversion would also likely delay the liquidation process and ultimate distribution of the Assets, and the Estates would be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals) that are allowed in the chapter 7 cases.

Accordingly, the Debtors believe that Holders of Allowed Claims and Interests would receive less than anticipated under the Combined Disclosure Statement and Plan if the Chapter 11 Cases were converted to chapter 7 cases, and therefore, the classification and treatment of Claims and Interests in the Combined Disclosure Statement and Plan complies with section 1129(a)(7) of the Bankruptcy Code.

## H.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. The Debtors are selling the Purchased Assets to the Ferring Purchaser pursuant to the Plan and Sale Transaction Documents and otherwise liquidating any remaining assets. The Debtors believe they will have sufficient resources from the net Sale Proceeds and additional Cash on hand as of the Effective Date to make all payments and distributions required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization. Therefore, the Debtors believe that the Sale Transaction and liquidation pursuant to the Plan meets the feasibility requirements of the Bankruptcy Code.

## I.    Eligibility to Vote on the Combined Disclosure Statement and Plan

Unless otherwise ordered by the Court, only Holders of Allowed FTG Equity Interests in Class 5 may vote on the Plan. Further, subject to the tabulation procedures that were approved by the Conditional Approval and Solicitation Procedures Order, in order to vote on the Combined Disclosure Statement and Plan, you must hold an Allowed FTG Equity Interest in Class 5, or be the Holder of an FTG Equity Interest that has been temporarily Allowed for voting purposes only pursuant to the approved tabulation procedures or under Bankruptcy Rule 3018(a).

## J.    Solicitation Package / Release Opt-In.

All Holders of Allowed FTG Equity Interests in Class 5 will receive a Solicitation Package. The Solicitation Packages will contain: (i) the Combined Disclosure Statement and Plan and all other exhibits annexed thereto; (ii) the Conditional Approval and Solicitation Procedures Order, excluding the exhibits annexed thereto; (iii) the Confirmation Hearing Notice; (iv) an appropriate Ballot, including voting instructions and a box to check for votes to opt in to the releases described in Article X.F of the Combined Disclosure Statement and Plan, and a pre-addressed, postage prepaid return envelope; and (v) such other materials as the Court may direct or approve or that the Debtors deem appropriate.

All other Holders of Claims not entitled to vote on the Combined Disclosure Statement and Plan will receive (i) a Notice of Non-Voting Status, (ii) an Opt-In Election Form, and (iii) the Confirmation Hearing Notice.  The Opt-In Election Form will allow such Holders to affirmatively opt in to the third-party releases set forth in Article X.F of the Combined Disclosure Statement and Plan.

Copies of the Combined Disclosure Statement and Plan will be available on the Voting Agent's website at https://omniagentsolutions.com/FinchTherapeutics.  Any Creditor or party in interest can request a hard copy of the Combined Disclosure Statement and Plan be sent to them by regular mail by calling the Voting Agent at (888) 204-0751 (US & Canada toll-free) and (747) 288-6369 (International) during regular business hours or via email to finchtherapeuticsinquiries@omniagnt.com.

K.      **Voting Procedures, Voting Deadline, and Applicable Deadlines**

The Voting Record Date for determining which Holders of FTG Equity Interests in Class 5 may vote on the Combined Disclosure Statement and Plan is July 15, 2026.  In order for your Ballot to count, you must (1) complete, date, and properly execute the Ballot and (2) properly deliver the Ballot to the Voting Agent by either (a) mailing the Ballot to the Voting Agent at the following address: Finch Therapeutics Group, Inc. c/o Omni Agent Solutions, Inc., 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367; or (b) uploading the Ballot on the Voting Agent's online balloting portal at https://omniagentsolutions.com/FinchTherapeutics-Ballots.  Instructions for casting a Ballot will be available on the Voting Agent's website.

Special procedures are set forth in the Conditional Approval and Solicitation Procedures Order for beneficial Holders who hold FTG Equity Interests through a broker, dealer, commercial bank, trust company, or other agent or nominee (a "Nominee").  If you received a Solicitation Package addressed to or sent from your Nominee, please return your Ballot to your Nominee allowing enough time for your Nominee to cast your vote on a Master Ballot before the Voting Deadline.  Please review the Conditional Approval and Solicitation Procedures Order for further information concerning such special voting instructions.

Ballots must be submitted electronically or the Voting Agent must actually receive physical, original Ballots by mail or overnight delivery, on or before the Voting Deadline, which is **August 24, 2026 at 4:00 p.m. (prevailing Eastern Time)**.  Subject to the tabulation procedures approved by the Conditional Approval and Solicitation Procedures Order, you may not change your vote once a Ballot is submitted electronically or the Voting Agent receives your original paper Ballot.  Subject to the tabulation procedures approved by the Conditional Approval and Solicitation Procedures Order, any Ballot that is timely and properly submitted electronically or received physically will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Combined Disclosure Statement and Plan.

**IF YOU ARE ENTITLED TO VOTE ON THE COMBINED DISCLOSURE STATEMENT AND PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE.  PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY.  IF YOU ARE A HOLDER OF AN FTG EQUITY INTEREST ENTITLED TO VOTE ON THE COMBINED DISCLOSURE**

37

**STATEMENT AND PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN OR PROCEDURES FOR VOTING ON THE COMBINED DISCLOSURE STATEMENT AND PLAN, PLEASE CONTACT THE VOTING AGENT BY (I) TELEPHONE AT (888) 204-0751 (US & CANADA TOLL-FREE) AND (747) 288-6369 (INTERNATIONAL) OR (II) EMAIL AT FINCHTHERAPEUTICSINQUIRIES@OMNIAGNT.COM. THE VOTING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

**THE DEBTORS URGE ALL HOLDERS OF FTG EQUITY INTERESTS ENTITLED TO VOTE TO EXERCISE THEIR VOTING RIGHT BY COMPLETING THEIR BALLOTS AND RETURNING THEM TO THE VOTING AGENT BY THE VOTING DEADLINE.**

**L.    Alternatives to Confirmation and Consummation of the Plan**

The Debtors have evaluated alternatives to the Plan and have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming Confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) a stand-alone sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code outside of a plan, or (ii) a liquidation of the Debtors and their respective assets under chapter 7 of the Bankruptcy Code.

1.    Stand-Alone Sale Under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets through a stand-alone alternative transaction under section 363 of the Bankruptcy Code. Upon analysis and consideration of this alternative, the Debtors do not believe that a stand-alone alternative sale of their assets under section 363 of the Bankruptcy Code (as opposed to the consummation of the Sale Transaction pursuant to the Plan) would yield a higher recovery for Holders of Claims and Interests than the Plan. A stand-alone sale transaction under section 363 of the Bankruptcy Code would require separate sale and plan confirmation proceedings, which would increase administrative expenses and delay distributions to stakeholders. In addition, a Sale Transaction consummated pursuant to a Plan may minimize transfer and other related taxes pursuant to section 1146(a) of the Bankruptcy Code, which may not be available in connection with stand-alone sales under section 363 of the Bankruptcy Code.

2.    Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code in which a chapter 7 trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to the Debtors' creditors in accordance with the priorities established by the Bankruptcy Code. The effect a chapter 7 liquidation would have on the recovery of Holders of Allowed Claims and Interests is discussed above in Article III.G and, as noted therein, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to Holders of Claims and Interests than those provided for in the Plan because of the delay resulting

from the conversion of the cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Chapter 11 Cases.

**M.      Risks and Other Considerations**

Holders of FTG Equity Interests should read and carefully consider the following factors, as well as the other information set forth in this Combined Disclosure Statement and Plan, the documents attached to this Combined Disclosure Statement and Plan, and the documents referred to or incorporated by reference in this Combined Disclosure Statement and Plan, before deciding whether to vote to accept or reject the Plan. These risk and other factors should not, however, be regarded as constituting the only factors to be considered in connection with the Plan and its implementation.

1.      The Debtors May Not Be Able to Secure Final Approval and Confirmation of this Combined Disclosure Statement and Plan

The Debtors must satisfy numerous requirements under the Bankruptcy Code to secure final approval and confirmation of this Combined Disclosure Statement and Plan. Although the Debtors believe that the Plan complies, or will comply, with all such requirements, there is no certainty that the Bankruptcy Court will agree. In addition, there can be no assurance that modifications of the Combined Disclosure Statement and Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Combined Disclosure Statement and Plan is not confirmed, it is unclear what distributions Holders of Allowed Claims or Allowed Interests ultimately would receive with respect to their Claims in a subsequent plan.

2.      Failure to Consummate this Combined Disclosure Statement and Plan

The Combined Disclosure Statement and Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Combined Disclosure Statement and Plan, there can be no assurance that any or all of the conditions in the Combined Disclosure Statement and Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Combined Disclosure Statement and Plan will be confirmed by the Bankruptcy Court. Further, if the Combined Disclosure Statement and Plan is confirmed, there can be no assurance that the Combined Disclosure Statement and Plan will go effective.

3.      The Ferring APA May Be Terminated

The Ferring APA may be terminated upon the occurrence of certain events set forth in Article 8 thereof, which would result in the failure of a condition to the effectiveness of the Combined Disclosure Statement and Plan.

4.      Plan Releases May Not Be Approved

There can be no assurance that the releases, as provided in Article X.F hereof, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan that differs from

39

the Combined Disclosure Statement and Plan, or the Combined Disclosure Statement and Plan not being confirmed.

5.      Risk Affecting Potential Recoveries

Projected distributions herein are based upon good faith estimates of the total amount of Claims and Interests ultimately Allowed and value of the Debtors' assets that will be available for Distribution.  There can be no assurance that the estimates set forth in this Combined Disclosure Statement and Plan are correct.  These estimated amounts are based on certain assumptions with respect to a variety of factors, including, but not limited to, the resolution of objections Filed to certain Claims and Interests.  Both the actual amount of Allowed Claims or Allowed Interests in a particular Class and the assets available for Distribution may differ from the Debtors' estimates.

6.      Parties May Object to the Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under this Combined Disclosure Statement and Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  A Holder of a Claim or Interest, however, could challenge the Debtors' classification.  In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Combined Disclosure Statement and Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification.  If the Bankruptcy Court concludes that the classifications of Claims and Interests under the Combined Disclosure Statement and Plan do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Combined Disclosure Statement and Plan.  The Combined Disclosure Statement and Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.

7.      Risks Associated with Financial Information

The financial information contained in this Combined Disclosure Statement and Plan has not been audited.  In preparing this Combined Disclosure Statement and Plan, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Combined Disclosure Statement and Plan, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

8.      Certain Tax Considerations

There are a number of material income tax considerations, risks, and uncertainties associated with the Combined Disclosure Statement and Plan.  Holders of FTG Equity Interests should carefully review the discussion of certain United States federal income tax consequences

in Article XIV of this Combined Disclosure Statement and Plan, entitled "Certain United States Federal Income Tax Considerations."

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE COMBINED DISCLOSURE STATEMENT AND PLAN.

## N.    No Duty to Update

Unless otherwise specified herein, or unless otherwise ordered to do so pursuant to an order from the Bankruptcy Court, the Debtors do not have a duty to update the information and disclosures contained in this Combined Disclosure Statement and Plan. Delivery of this Combined Disclosure Statement and Plan after the date hereof does not imply that the information contained herein has not changed.

## ARTICLE IV
## ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS, RESTRUCTURING EXPENSES, PRIORITY TAX CLAIMS, AND UNITED STATES TRUSTEE FEES

## A.    Unclassified Claims

The following constitute unclassified Claims that are Unimpaired and, therefore, not entitled to vote on this Plan:

1.    Administrative Claims;

2.    Professional Claims;

3.    Restructuring Expenses;

4.    Priority Tax Claims; and

5.    Quarterly Fees

## B.    Administrative Claims

1.    Administrative Claims Generally

Subject to the provisions of sections 330(a), 331, and 503(b) of the Bankruptcy Code, each Allowed Administrative Claim shall receive: (i) Cash, in such amount as such Administrative Claim is Allowed on or as soon as reasonably practicable after the Effective Date or, if such Administrative Claim is not Allowed as of the Effective Date, upon entry of a Final Order allowing such Administrative Claim or as soon as reasonably practicable thereafter; (ii) Cash or treatment

41

in such other amount as may exist or be incurred in the ordinary course of the Debtors' business; or (iii) such other less favorable treatment as may be agreed upon in writing between the Holder of such Allowed Administrative Claim and the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, in each case in full satisfaction, settlement, discharge and release of such Allowed Administrative Claim.

2.    Deadline to File Administrative Claims

Holders of Administrative Claims, other than: (a) Professional Claims; (b) Administrative Claims that have been Allowed on or before the Effective Date; (c) Section 503(b)(9) Claims; (d) Administrative Claims arising, in the ordinary course of business, out of the employment by one or more Debtors of an individual from and after the Petition Date; and (e) Administrative Claims held by the United States Trustee, must File with the Bankruptcy Court and serve upon the Debtors and the Plan Administrator **a request for payment of such Administrative Claim so as to be received by 5:00 p.m. (prevailing Eastern Time) on the applicable Administrative Claims Bar Date**.  Such request for payment of Administrative Claim must include at a minimum: (i) the name of the applicable Debtor that is purported to be liable for the Administrative Claim; (ii) the name of the Holder of the Administrative Claim; (iii) the asserted amount of the Administrative Claim; (iv) the basis of the Administrative Claim; and (v) supporting documentation for the Administrative Claim.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE OR WERE REQUIRED TO, BUT DO NOT OR DID NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE APPLICABLE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS OR THEIR PROPERTY, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

The Debtors, Liquidating Debtors, or the Plan Administrator, as applicable, may File and serve objections to Administrative Claims on or before the Administrative Claims Objection Deadline.

3.    Treatment of Allowed Administrative Claims

The Debtors, Liquidating Debtors, and Plan Administrator, as applicable, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval.  The Debtors, Liquidating Debtors, and Plan Administrator may also choose to object to any Administrative Claim no later than the Administrative Claims Objection Deadline, subject to extensions by the Bankruptcy Court upon a motion by the Debtors, Liquidating Debtors, or Plan Administrator or an agreement in writing of the parties.  Unless the Debtors, Liquidating Debtors, or Plan Administrator (or other party with standing) object to a timely-Filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested.  In the event that the Debtors, Liquidating Debtors, or the Plan Administrator object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

**C.       Professional Claims**

1.       Deadline to File Professional Claims

Any Professional seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328, 330, 331, or 503(b)(2) of the Bankruptcy Code shall File, on or before the Professional Claims Bar Date, final requests for payment of such Professional Claims.   The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims in accordance with the procedures established by order of the Bankruptcy Court, the Bankruptcy Code, and/or the Bankruptcy Rules.

2.       Payment of Professional Claims

The Debtors or the Plan Administrator, as applicable, shall pay Professional Claims in Cash to the applicable Professionals in the amounts approved by the Bankruptcy Court, as soon as reasonably practicable after all such Professional Claims are Allowed by entry of a Final Order of the Bankruptcy Court.

3.       Final Fee Applications

All final requests for allowance and payment of Professional Claims must be Filed with the Bankruptcy Court no later than the Professional Claims Bar Date unless otherwise ordered by the Bankruptcy Court.   Any objections to Professional Claims shall be Filed and served no later than twenty-one (21) days after the Filing of final requests for allowance and payment of Professional Claims.

4.       Professional Claims Escrow Account

No later than the Effective Date, the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, shall establish and fund the Professional Claims Escrow Account with Cash equal to the Professional Claims Escrow Amount.   The Professional Claims Escrow Account shall be maintained in trust solely for the Professionals until all Professional Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.   No Liens, claims, or interests shall encumber the Professional Claims Escrow Account or Cash held in the Professional Claims Escrow Account in any way.   No funds held in the Professional Claims Escrow Account shall be property of the Estates of the Debtors or any respective successors thereto, as applicable, except to the extent such funds exceed the Professional Claims Allowed by the Bankruptcy Court.   When all Professional Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Claims Escrow Account shall be turned over to the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

5.       Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan or the Plan Supplement, from and after the Effective Date, the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors, Liquidating Debtors, or the Plan Administrator, as applicable, on and after the Effective Date.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Plan Administrator may employ and pay any Professional in the ordinary course of business for the period after the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

**D.       Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors, Liquidating Debtors, or Plan Administrator, as applicable (solely as to whether such payment in full shall be made pursuant to the following clauses (i)-(ii)): (i) Cash in an amount equal to such Allowed Priority Tax Claim on the later of (a) the Effective Date or as soon as reasonably practicable thereafter, (b) the first Business Day after the date that is thirty (30) days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or as soon thereafter as is reasonably practicable; or (ii) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date.  Except as may otherwise be set forth in an Order, Holders of Allowed Priority Tax Claims shall retain any tax Liens on their collateral to the same validity, extent and priority as existed on the Petition Date until all validly determined taxes and related interest, penalties, and fees (if any) have been paid in full.  To the extent a Holder of an Allowed Priority Tax Claim is not paid in the ordinary course of business, payment of the Allowed Priority Tax Claim shall include interest through the date of payment at the applicable state statutory rate, as set forth in sections 506(b), 511, and 1129 of the Bankruptcy Code.

**E.       Restructuring Expenses**

Pursuant to sections 503(b)(1), 1123(b)(6), and 1129(a)(4) and as a requirement for Crestovo's participation in bidding at the Auction and agreement to serve as the Back-Up Bidder, the Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall constitute Allowed Administrative Claims and shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of these Chapter 11 Cases).  Such payment shall not be subject to any requirement that (i) any party File any application with the Bankruptcy Court or (ii) the Bankruptcy Court enter any further orders.

44

Each invoice for Restructuring Expenses may include a good faith estimate of fees and expenses to be incurred through the Effective Date and all such invoices shall be delivered to the Debtors at least ten (10) Business Days before the Anticipated Effective Date.

**F.       United States Trustee Fees**

All fees under section 1930 of Title 28 of the United States Code plus any interest thereon pursuant to 31 U.S.C. § 3717 ("Quarterly Fees") payable on or before the Effective Date shall be paid by the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, in full in Cash on the Effective Date or as soon as reasonably practicable thereafter. On and after the Effective Date, the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, shall pay any and all Quarterly Fees in full in Cash when due in each Chapter 11 Case for each quarter (including any fraction thereof) until the earliest of such Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. The Debtors, Liquidating Debtors, or Plan Administrator, as applicable, shall File all monthly operating reports due before the Effective Date when they become due using UST Form 11-MOR. After the Effective Date, the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, shall File with the Bankruptcy Court a post-confirmation quarterly report for each Chapter 11 Case for each quarter (including any fraction thereof) such case is pending, using UST Form 11-PCR. Notwithstanding anything to the contrary in the Plan, (i) Quarterly Fees are Allowed; (ii) the United States Trustee shall not be required to File any proof of claim or any other request(s) for payment with respect to Quarterly Fees; and (iii) the United States Trustee shall not be treated as providing any release under the Plan.

**ARTICLE V**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

**A.       Classification of Claims and Interests**

Except for Claims not classified as specified in Article IV.A hereof, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article V for all purposes, including voting, confirmation of the Plan, and distributions pursuant to the Plan and in accordance with section 1122 and section 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. Neither the classification of a Claim or Interest nor anything else in the Plan shall be deemed to affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets.

45

**B.      Summary of Classification**

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is set forth in the following chart.  The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article V hereof.  Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis.[7]

| Classified Claims and Interests of the Debtors | | | |
|---|---|---|---|
| Class | Claim or Interest | Status | Voting Rights |
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | FTG Equity Interests | Impaired | Entitled to Vote |
| Class 6 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**C.      Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors, Liquidating Debtors, or the Plan Administrator, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**D.      Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against, and Allowed Interests in, the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors, Liquidating Debtors, or the Plan Administrator, as applicable,

---

[7]    The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

46

reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**E.    Treatment of Claims and Interests**

    1.    <u>Class 1 – Other Secured Claims</u>

        (i)    <u>Classification</u>: Class 1 consists of all Other Secured Claims against the applicable Debtor.

        (ii)    <u>Treatment</u>: Except to the extent that a Holder of an Allowed Other Secured Claim and the applicable Debtor, Liquidating Debtor, or the Plan Administrator agree to less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter or after such Other Secured Claim becomes Allowed, each Holder of an Allowed Other Secured Claim shall receive, at the Debtors', Liquidating Debtors', or Plan Administrator's option, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Other Secured Claim: (a) payment in full in Cash, plus postpetition interest thereon from the Petition Date through and including the date of satisfaction in full in Cash at the non-default contract rate or the Federal Judgment Rate, as applicable; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

        (iii)    <u>Voting</u>: Class 1 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

    2.    <u>Class 2 – Other Priority Claims</u>

        (i)    <u>Classification</u>: Class 2 consists of all Other Priority Claims against the applicable Debtor.

        (ii)    <u>Treatment</u>: Except to the extent that a Holder of an Allowed Other Priority Claim and the applicable Debtor, Liquidating Debtor, or the Plan Administrator agree to less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter or after such Other Priority Claim becomes Allowed, each Holder of an Allowed Other Priority Claim shall receive, at the Debtors', Liquidating Debtors', or Plan Administrator's option, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Other Priority Claim: (a) payment

47

in full in Cash, plus postpetition interest thereon from the Petition Date through and including the date of satisfaction in full in Cash at the non-default contract rate or the Federal Judgment Rate, as applicable; (b) Reinstatement of its Allowed Other Priority Claim; or (c) such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(iii)    Voting: Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 – General Unsecured Claims

(i)    Classification: Class 3 consists of all General Unsecured Claims against the applicable Debtor.

(ii)    Allowance: The Allowed amount of all General Unsecured Claims will be determined pursuant to the terms of this Plan, the Bankruptcy Code, and other applicable law. For purposes of this Article V.F.3, except as otherwise agreed upon pursuant to a settlement with the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, the Allowed amount of any General Unsecured Claim shall include all interest accrued from the Petition Date through the Effective Date at the Federal Judgment Rate; *provided*, *however*, to the extent postpetition interest is due and owing with respect to Rejection Claims, postpetition interest shall accrue at the non-default contract rate or the Federal Judgment Rate, as applicable.

(iii)    Treatment: Except to the extent that a Holder of a General Unsecured Claim and the applicable Debtor, Liquidating Debtor, or the Plan Administrator agree to less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter or after such General Unsecured Claim becomes Allowed, each Holder of an Allowed General Unsecured Claim shall receive, at the Debtors', Liquidating Debtors', or Plan Administrator's option, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed General Unsecured Claim: (a) payment in full in Cash; (b) Reinstatement of its Allowed General Unsecured Claim; or (c) such other treatment rendering its Allowed General Unsecured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(iv)    Voting: Class 3 is Unimpaired under the Plan. Holders of Allowed General Unsecured Claims are conclusively presumed to have

48

accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan.

4.  Class 4 – Intercompany Claims

   (i)   Classification: Class 4 consists of all Intercompany Claims against the applicable Debtor.

   (ii)  Treatment: On the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Intercompany Claim shall receive, at the Debtors', Liquidating Debtors', or Plan Administrator's option, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Intercompany Claim: (a) payment in full in Cash; or (b) Reinstatement of its Allowed Intercompany Claim.

   (iii) Voting: Class 4 is Unimpaired under the Plan.  Holders of Allowed Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan.

5.  Class 5 – FTG Equity Interests

   (i)   Classification: Class 5 consists of all FTG Equity Interests.

   (ii)  Treatment: On the Effective Date, all FTG Equity Interests shall be cancelled, released, and extinguished, and shall be of no further force or effect, whether surrendered for cancellation or otherwise. Notwithstanding such cancellation, except to the extent that a Holder of an FTG Equity Interest and the Debtors, Liquidating Debtors, or the Plan Administrator agree to less favorable treatment, each Holder of an Allowed FTG Equity Interest shall be entitled to receive their *Pro Rata* share of the distributions from Available Cash, consistent with their respective interests in FTG as of the Distribution Record Date, as soon as reasonably practicable after the Effective Date and in full and final satisfaction, settlement, release, and discharge of such FTG Equity Interests.

   (iii) Voting: Class 5 FTG Equity Interests are Impaired, and such Holders are entitled to vote to accept or reject the Plan.

6.  Class 6 – Intercompany Interests

   (i)   Classification: Class 6 consists of all Intercompany Interests in each Debtor held by another Debtor.  Class 6 does not include any FTG Equity Interests, which are classified and treated in Class 5.

49

(ii)    Treatment: Unless otherwise determined by the Debtors, Liquidating Debtors, or the Plan Administrator, on the Effective Date and in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Intercompany Interest, each Intercompany Interest shall either be cancelled, released, extinguished, reinstated, transferred, set off, settled, or otherwise addressed pursuant to the Sale Transaction such that such Intercompany Interests are, to the extent reasonably practicable, treated in a tax-efficient manner. Each Holder of an Intercompany Interest shall not receive or retain any distribution, property, or other value on account of its Intercompany Interest.

(iii)   Voting: Class 6 is Impaired, and the Holders of Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

## F.    Voting Classes; Deemed Acceptance by Non-Voting Classes

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims or Interests in such Class.

## G.    Voting; Presumptions; Solicitation

1.    Acceptance by Certain Impaired Classes. Holders of Allowed FTG Equity Interests in Class 5 shall receive Ballots and are entitled to vote to accept or reject the Plan.

2.    Conclusive Presumption of Acceptance by Unimpaired Classes. Holders of Claims in Classes 1, 2, 3, and 4 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject the Plan.

3.    Conclusive Presumption of Rejection by Intercompany Interests. Holders of Intercompany Interests in Class 6 are Impaired and conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

## H.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XIII.B hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules. Notwithstanding that Class 5 FTG Equity Interests are Impaired and entitled

50

to vote on this Plan, if Class 5 votes to reject this Plan, section 1129(b) of the Bankruptcy Code permits confirmation of a plan over the rejection of an Impaired Class of Interests, provided certain requirements are satisfied.  Because no Class of Interests junior to Class 5 will receive or retain any property under this Plan, the "fair and equitable" requirement of section 1129(b)(2)(C)(ii) of the Bankruptcy Code is satisfied.  Accordingly, the Debtors submit that this Plan may be confirmed under section 1129(b) of the Bankruptcy Code by cramming down the Holders of the FTG Equity Interests in Class 5, who will nonetheless be entitled to receive their *Pro Rata* share of Available Cash in accordance with their respective ownership interests as of the Distribution Record Date.

**I.      Elimination of Vacant Classes**

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code with respect to that Class.

**J.      Separate Classification of Other Secured Claims**

Each Other Secured Claim, to the extent secured by a Lien on collateral different from the collateral securing another Other Secured Claim, shall be treated as being in a separate sub-Class for purposes of receiving distributions under this Plan.

**K.      Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**ARTICLE VI**
**MEANS FOR IMPLEMENTATION**

**A.      Sale of Purchased Assets**

1.      <u>Approval of Sale of Purchased Assets</u>.  As permitted by sections 1123(a)(5), 1123(b), and 1141(c) of the Bankruptcy Code, the Debtors have sought approval of the sale of the Purchased Assets to the Ferring Purchaser in accordance with the terms of the Bidding Procedures and Sale Motion, Bidding Procedures, the Ferring APA and other Sale Transaction Documents, and this Plan.  Confirmation of the Plan by the Bankruptcy Court shall constitute approval of the proposed sale of the Purchased Assets and the Ferring APA and other Sale Transaction Documents and authorization for the Debtors to execute and deliver such documents, agreements, and instruments and otherwise take such action as required or deemed necessary to consummate the Sale Transaction.

2.      <u>Sale of Purchased Assets</u>.  On or prior to the Effective Date, the Debtors shall consummate the sale and transfer of the Purchased Assets to the Ferring Purchaser and assume the Assigned Executory Contracts and Unexpired Leases and assign them to the Ferring Purchaser

51

and, in exchange, Ferring Purchaser shall pay the Purchase Price (as defined in the Ferring APA) to the Debtors.  The Ferring Purchaser and the Debtors shall cooperate and take such actions as are provided in the Ferring APA and other Sale Transaction Documents to consummate the Sale Transaction.

3.     Sale Free and Clear.  On or prior to the Effective Date, except for the Assumed Liabilities and Permitted Liens (each as defined in the Ferring APA), the Purchased Assets shall, in accordance with sections 363, 1123(b)(4), and 1141(c) of the Bankruptcy Code, be purchased by or otherwise transferred to the Ferring Purchaser pursuant to the Ferring APA and other Sale Transaction Documents free and clear of all Claims, Interests, Liens, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any successor or transferee liabilities.

**B.     No Substantive Consolidation**

The Plan is being proposed as a joint chapter 11 plan of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor.  The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

**C.     Restructuring Transactions; Effectuating Documents**

Prior to, on, or after the Effective Date, the Debtors, Liquidating Debtors, or the Plan Administrator, as applicable, may take any and all actions as may be necessary or appropriate in the Debtors', Liquidating Debtors', or the Plan Administrator's reasonable discretion to effectuate the transactions described in, approved by, contemplated by, or necessary to effectuate the Plan, in accordance with the Definitive Documents, including: (i) the execution and delivery of any agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, arrangement, continuance, dissolution, sale, purchase, or liquidation, in each case, containing terms that are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iii) the filing of any appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; (iv) such other transactions that are required to effectuate the transactions contemplated herein, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, issuance of shares, formations, organizations, dissolutions, release of liens, or liquidations; and (v) all other actions that the Debtors, Liquidating Debtors,  or the Plan Administrator, as applicable, determine to be necessary or appropriate, including in connection with making filings or recordings that may be required by applicable law in connection with the Plan.  The Sale Transaction and other Restructuring Transactions shall be implemented and structured in a manner that takes into account the tax position, and to maximize all tax efficiencies thereof, of creditors, the Debtors, Liquidating Debtors, and the Plan Administrator.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363, 1123, and 1142(b) of the Bankruptcy Code, authorize and direct, among other things, all actions as may be

necessary or appropriate by any necessary parties to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Sale Transaction and other Restructuring Transactions, and the cancellation, redemption, or reinstatement of Intercompany Interests (as applicable).

Except as otherwise set forth herein, each of the matters provided for by this Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Debtors, Liquidating Debtors, or the Plan Administrator, as applicable, whether taken prior to or as of the Effective Date, shall be authorized without the need for any approvals, authorizations, or consents except for those expressly required pursuant to this Plan and the other Definitive Documents (as applicable) or required under the Debtors', Liquidating Debtors', or Plan Administrator's applicable corporate documents or applicable foreign nonbankruptcy law, consistent with the terms and conditions of this Plan and the other Definitive Documents (as applicable).

### D.    Sources of Consideration for Plan Distributions

Except as otherwise provided in the Plan or the Confirmation Order, the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, shall fund distributions, make payments, and establish reserves and escrows under the Plan using (i) Cash on hand from the Debtors as of the Effective Date, and (ii) Cash proceeds from the sale of the Purchased Assets to Ferring Purchaser through the Sale Transaction.

### E.    Plan Administrator

1.    <u>Appointment</u>.  On the Effective Date, the Plan Administrator shall be appointed by the Debtors.  The identity of the initial Plan Administrator will be disclosed prior to the Effective Date.

2.    <u>Authority</u>.  Upon the Effective Date, the Plan Administrator shall have the authority and right on behalf of each Debtor without the need for Bankruptcy Court approval (unless otherwise indicated) or any action of the Debtors or their officers, directors, or managers, to carry out and implement all provisions of the Plan, including, without limitation, to:

(a)    except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors;

(b)    make Distributions to Holders of Allowed Claims and Allowed Interests in accordance with the Plan;

(c)    exercise its reasonable business judgment to direct and control the wind down, liquidation, marketing, sale and/or abandoning of the remaining assets of the Debtors under the Plan (to the extent not constituting Purchased Assets under the Ferring APA and Sale Transaction Documents) and in accordance with applicable law as necessary to maximize Plan distributions to Holders of Allowed Claims against and Allowed Interests in the Debtors;

(d)    prosecute all Causes of Action not transferred to the Ferring Purchaser pursuant to the Sale Transaction Documents, elect not to pursue any such Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Estates;

(e)    make payments to existing Professionals who will continue to perform in their current capacities;

(f)    retain and compensate any other or additional professionals to assist in performing its duties under the Plan;

(g)    maintain the books and records and accounts of the Debtors;

(h)    invest Cash of the Debtors, including any Cash proceeds realized from the liquidation of any assets of the Debtors, including any Causes of Action, and any income earned thereon;

(i)    establish appropriate reserves and escrows under the Plan, including a Disputed Claims Reserve and Professional Claims Escrow Account, and incur and pay reasonable and necessary expenses in connection with the performance of its duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(j)    administer each Debtor's tax obligations, including (i) filing tax returns or other tax forms, making tax elections, and paying tax obligations, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its Estate under section 505(b) of the Bankruptcy Code for all taxable periods of such Debtor ending after the Petition Date through the liquidation of such Debtor as determined under applicable tax laws and (iii) representing the interest and account of each Debtor or its Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(k)    prepare and file any and all informational returns, reports, statements, or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law;

(l)    pay statutory fees in accordance with the Plan;

(m)    cooperate with the Ferring Purchaser and take such post-closing actions and have such post-closing rights as set forth in the Sale Transaction Documents;

(n)    effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; and

54

(o)    perform other duties and functions that are consistent with the implementation of the Plan and exercise such other powers as may be vested in the Plan Administrator by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Plan Administrator to be necessary and proper to implement the provisions of the Plan.

3.      Fees and Expenses.  The Plan Administrator shall receive reasonable compensation for services rendered pursuant to the Plan without further Bankruptcy Court Order.  From and after the Effective Date, the Plan Administrator shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable expenses (including professional fees) incurred by the Plan Administrator and any professionals retained by the Plan Administrator from the Debtors' Assets, as further set forth in the Plan Administrator Agreement. The Plan Administrator shall not be required to give any bond, surety, or other security for the performance of its duties.

4.      Privilege and Work Product.  All of the privileges and work product of the Debtors, including but not limited to any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral) related to the Causes of Action, shall be vested in and maintained by the Plan Administrator.  Subject to the Plan Administrator Agreement, the Plan Administrator, in its sole discretion, will have exclusive authority to waive or not waive such privileges of the Debtors.

## F.      Officers and Directors

As of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Plan Administrator, the Debtors, or the Liquidating Debtors or any of their respective officers, directors, managers, shareholders, or members, and any remaining officers, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, or the members of any Debtor.

## G.      Wind Down and Dissolution of Liquidating Debtors

1.      Upon the Effective Date: (i) the authority, power and incumbency of the persons then acting as directors and officers of the Debtors shall be terminated and such directors and officers shall be deemed to have resigned, (ii) the Plan Administrator shall have the powers of an officer, director, and managers, as applicable, of each Debtor and Liquidating Debtor, (iii) the Debtors shall assign and transfer absolutely and unconditionally to the Plan Administrator all of their remaining Assets after accounting for all distributions made in accordance with Article V hereof.

2.      Subject in all respects to the terms of the Plan, as soon as practicable after the Effective Date and the making of all distributions set forth in Article V hereof, the Liquidating Debtors or the Plan Administrator shall, without having to obtain stockholder, board, director, manager, member or equivalent approval, file for the Liquidating Debtors a certificate of dissolution, certificate of cancellation, or such similar document for each Liquidating Debtor, together with all other necessary corporate and company documents, to effect the dissolution or

55

termination of the existence of the Liquidating Debtors under the applicable laws of their state of incorporation or formation (as applicable), and take any such other actions as the Liquidating Debtors or the Plan Administrator may determine to be necessary or desirable to implement the wind down of the Liquidating Debtors.

## H.    Implementation of the Plan

The Liquidating Debtors and the Plan Administrator shall be authorized without further action of the Bankruptcy Court (unless otherwise indicated), to otherwise carry out and implement all provisions of this Plan, including, without limitation to: (i) control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors; (ii) prosecute all Retained Causes of Action, elect not to pursue any Retained Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Retained Causes of Action, as determined in such Liquidating Debtors' reasonable business judgment to be in the best interests of such Liquidating Debtor and its Estate; (iii) retain professionals to assist in performing its duties under this Plan; (iv) maintain its books records, and accounts; (v) complete and file, as necessary, all required federal, state and local tax returns or forms; and (vi) take all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Sale Transaction including (a) the execution and delivery of appropriate agreements, including the Ferring APA and other Sale Transaction Documents, or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer arrangement, continuance, dissolution, cancellation, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (b) the execution and delivery of appropriate instruments of transfer assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates or articles of incorporation reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, cancellation or dissolution pursuant to applicable state or federal law; (d) the execution and delivery of the Definitive Documents; (e) such other transactions that are necessary or appropriate to implement the Plan in the most tax efficient manner; and (f) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

## I.    Corporate Existence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, each Liquidating Debtor, as applicable, shall continue to exist as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which the particular Debtor is incorporated or formed and pursuant to their respective certificate of incorporation and bylaws (or other similar formation and governance documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other similar formation and governance documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite formalities, filings, and/or publications required under applicable state, provincial,

local, or federal law); *provided*, *however*, that after the Effective Date, the Plan Administrator shall take such steps as is necessary to wind down, terminate, cancel, dissolve or otherwise terminate the corporate existence of the Debtors within such time following the Effective Date as the Plan Administrator deems prudent, in the exercise of his or her reasonable business judgment, without having to obtain stockholder, board, director, manager, member or equivalent approval.

## J.        Corporate Governance

Upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by the Plan, including any action to be undertaken by Liquidating Debtors or  Plan Administrator, shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, the Liquidating Debtors, the Plan Administrator, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors or the Liquidating Debtors, and any corporate action required by the Debtors, the Liquidating Debtors, or the Plan Administrator in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors, the Liquidating Debtors, or the Plan Administrator.

## K.        Vesting of Assets in the Liquidating Debtors and Plan Administrator

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets in each Debtor's Estate, including all claims, rights, and Causes of Action (other than the Professional Claims Escrow Account), excluding the Purchased Assets that are sold, transferred, and assigned to the Ferring Purchaser under the Sale Transaction Documents, and any property acquired by any of the Debtors under the Plan shall vest in the Liquidating Debtors, free and clear of all Liens, Claims, charges and/or other encumbrances, to be administered by the Plan Administrator as set forth herein.

## L.        Cancellation of Existing Documents and Instruments

Except as otherwise provided in the Plan and except for the purpose of evidencing a right to a distribution under the Plan, on the Effective Date: (i) all FTG Equity Interests shall be cancelled, released, and extinguished, and shall be of no further force or effect, whether surrendered for cancellation or otherwise; *provided*, *however*, that notwithstanding such cancellation, each Holder of an Allowed FTG Equity Interest shall retain the right to receive their *Pro Rata* share of distributions from Available Cash in accordance with Article V.F.5 hereof; (ii) excluding any Intercompany Interests and any other certificates, notes, or other instruments or documents evidencing or creating indebtedness or obligations of (or ownership interest in) the Debtors that are Reinstated pursuant to the Plan (if any), any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest shall be deemed cancelled, discharged and of no force or effect, without further action or approval of the Bankruptcy Court, the Debtors, or any Holder; and (iii) the obligations of the Debtors pursuant, relating, or pertaining to any other contracts, agreements,

indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, loans, credit facilities, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such other agreements, indentures, certificates, notes, or other instruments or documents evidencing or creating indebtedness or obligations of the Debtors that are Reinstated pursuant to the Plan (if any)) shall be released and discharged.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect solely in connection with such cancellations, terminations, satisfactions, releases or discharges.

## M.     Corporate Action

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, and the Debtors, the Liquidating Debtors, and Plan Administrator, as applicable, shall be authorized to take all further corporate actions necessary to effectuate the Plan and the Restructuring Transactions.  To the extent permitted by applicable Law, upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Liquidating Debtors, and any corporate action required by the Debtors or the Liquidating Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the shareholders, directors, or officers of the Debtors or the Liquidating Debtors, unless required by applicable Law.  On or before the Effective Date, as applicable, the appropriate officer(s) of the Debtors or the Liquidating Debtors shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of the Debtors and Liquidating Debtors, as applicable and to the extent not previously authorized by the Bankruptcy Court.  To the extent permitted by applicable Law, the authorizations and approvals contemplated by this Article shall be effective notwithstanding any requirements under non-bankruptcy law.

## N.     Exemption From Certain Taxes and Fees

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code and applicable law, the (i) issuance, transfer or exchange of any securities, instruments, or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property pursuant to the Plan, the Plan Supplement, or Sale Transaction Documents, (iv) any assumption, assignment, or sale by the Debtors of their interests in Executory Contracts or Unexpired Leases pursuant to section 365(a) of the Bankruptcy Code, and (v) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under in furtherance of, or in connection with, the Plan, including the Confirmation Order, or the Sale Transaction Documents shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording

tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

## O.      Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article X hereof, the Liquidating Debtors and Plan Administrator shall retain and may enforce all rights to commence and pursue, as appropriate, any and all of the Retained Causes of Action, including any Retained Causes of Action specifically enumerated in the Plan, the Confirmation Order, the Plan Supplement, or the Disclosure Statement.  The Liquidating Debtors and Plan Administrator shall have the right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  The Liquidating Debtors and Plan Administrator, as applicable, expressly reserve all rights to prosecute any and all Retained Causes of Action.  For the avoidance of doubt, "Retained Causes of Action" shall not include any Causes of Action included within the definition of Purchased Assets that are sold to Ferring Purchaser pursuant to the Ferring APA and other Sale Transaction Documents.

No Entity may rely on the absence of a specific reference in the Plan, the Confirmation Order, the Plan Supplement, or the Disclosure Statement to any Retained Cause of Action against it as any indication that the Liquidating Debtors or Plan Administrator, as applicable, shall not pursue any and all available Retained Causes of Action against it.  Unless such Retained Causes of Action against any Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan or a Final Order, all such Retained Causes of Action shall be expressly reserved by the Debtors (pre-Effective Date) or the Liquidating Debtors and Plan Administrator (post-Effective Date), as applicable, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to any Retained Cause of Action upon, after, or as a consequence of the occurrence of the Confirmation Date or the Effective Date.

The Liquidating Debtors and Plan Administrator reserve and shall retain such Retained Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  The Liquidating Debtors and Plan Administrator, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Retained Causes of Action on and after the Effective Date.  Notwithstanding anything to the contrary contained in this Article, on the Effective Date, all Avoidance Actions (to the extent they are not Purchased Assets under the Ferring APA and Sale Transaction Documents) shall be Retained Causes of Action.

59

**P.      Insurance Policies**

1.      Director and Officer Liability Insurance

On the Effective Date, the Debtors shall be deemed to have assumed all D&O Policies with respect to the Debtors' directors, managers, officers, and employees, as applicable, who served in such capacity at any time on or prior to the Effective Date pursuant to sections 105 and 365 of the Bankruptcy Code.   Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the D&O Policies.

After the Effective Date, none of the Debtors or the Liquidating Debtors shall terminate or otherwise reduce the coverage under any D&O Policies in effect on the Effective Date with respect to conduct occurring prior thereto, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date, *provided* that nothing in this paragraph shall (i) preclude a reduction in the amount of available policy proceeds under the D&O Policies through payment of claims under any D&O Policies to or on behalf of the Debtors or the Liquidating Debtors, to the extent each D&O Policy provides for such reduction, or (ii) obligate the Liquidating Debtors or Plan Administrator to renew any existing D&O Policies.

2.      Assumption of Insurance Policies

Notwithstanding anything to the contrary in the Definitive Documents, the Bar Date Order, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, or confers Bankruptcy Court jurisdiction):

(a)      on the Effective Date, each Insurance Policy shall be assumed by the applicable Liquidating Debtor pursuant to sections 105 and 365 of the Bankruptcy Code in its entirety, such that, on and after the Effective Date, the Liquidating Debtors shall become and remain liable in full for all of their and the Debtors' obligations (as applicable) under the respective Insurance Policy, regardless of whether such obligations arise before or after the Effective Date.   Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Liquidating Debtors' assumption of each of such Insurance Policies.

(b)      nothing in the Definitive Documents shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any Insurer, (b) any rights or obligations of the Debtors or the Liquidating Debtors arising out of or under any Insurance Policy, or (c) the terms and conditions of the Insurance Policies; and

(c)      the Insurers, the Debtors, and the Liquidating Debtors, as applicable, shall retain all rights and defenses under the Insurance Policies, and the Insurance

60

Policies shall apply to, and be enforceable by and against, the insureds, Insurers and the Liquidating Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Petition Date, and for all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Policies shall control.

For the avoidance of doubt, nothing contained in the Plan or the Confirmation Order shall operate to require any Insurer to indemnify or pay the liability for any claim that it would not have been required to pay in the absence of the Plan and Confirmation Order.

       3.          Insurance Neutrality

Nothing in the Plan or the Confirmation Order shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any Insurer or (b) any rights or obligations of the Debtors or the Liquidating Debtors arising out of or under any Insurance Policy. The Insurers, the Debtors, and Liquidating Debtors, as applicable, shall retain all rights and defenses under such Insurance Policies, and such Insurance Policies shall apply to, and be enforceable by and against, the insureds and the Liquidating Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date. Further, for all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Policies shall control. For the avoidance of doubt, nothing contained in the Plan or the Confirmation Order shall operate to require any Insurer to indemnify or pay the liability for any claim that it would not have been required to pay in the absence of the Plan and Confirmation Order.

## Q.      Indemnification of Directors, Managers, Officers, and Employees

For purposes of the Plan, the Indemnification Obligations shall be assumed and irrevocable and shall survive Confirmation of the Plan and the Effective Date. On and after the Effective Date, the coverage under any of the D&O Policies in effect on the Petition Date shall not be terminated or otherwise reduced by or on behalf of the Debtors, and all directors, managers, officers, and employees of the Debtors at any time shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors, managers, officers, and/or employees remain in such positions after the Effective Date.

## R.      Closing of the Chapter 11 Cases

On and after the Effective Date, the Plan Administrator or the Debtors, as applicable, shall be permitted to seek authority from the Bankruptcy Court to close one or more of the Debtors' Chapter 11 Cases in accordance with Bankruptcy Rule 3022.

## S.      Retention of Books and Records

Upon the occurrence of the Effective Date, the Debtors' books and records (to the extent not constituting Purchased Assets under the Ferring APA and other Sale Transaction Documents) shall be transferred to the Liquidating Debtors and Plan Administrator, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the

61

Debtors' business that are currently in the Debtors' possession, custody or control; *provided, however,* that the Plan Administrator may, in the exercise of his or her reasonable business judgment and subject to the terms of the Ferring APA and other Sale Transaction Documents, abandon such books and records as may be found unnecessary or burdensome as and when the Plan Administrator may deem appropriate.

**ARTICLE VII**
**DISTRIBUTIONS**

**A.     Timing and Calculation of Amounts to Be Distributed**

     1.     <u>Allowed Claims</u>

Except (a) as otherwise provided herein (including, without limitation, in Article V hereof), (b) upon a Final Order, or (c) as otherwise agreed to by the Debtors, the Liquidating Debtors, or the Plan Administrator, as applicable, and the Holder of the applicable Claim, on the Effective Date or as soon as reasonably practicable thereafter, the Plan Administrator shall make one or more distributions under the Plan to each Holder of an Allowed Claim up to the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class.  If a Claim is not an Allowed Claim on the Effective Date, the Plan Administrator shall make such distribution as soon as reasonably practicable after, and solely to the extent that, such Claim becomes an Allowed Claim.  In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the following Business Day, but shall be deemed to have been completed as of the required date.  Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII hereof.

     2.     <u>Allowed Class 5 FTG Equity Interests</u>

As soon as reasonably practicable after the Effective Date and after all Allowed Claims are paid in full or otherwise sufficiently reserved for under the Plan, including in the Disputed Claims Reserve, the Plan Administrator shall make one or more distributions under the Plan from Available Cash to each Holder of an Allowed FTG Equity Interest *Pro Rata* based on each Holder of an Allowed FTG Equity Interest's respective Interest in FTG as of the Distribution Record Date, as reflected in the Debtors' stock ledger, the records of the Debtors' transfer agent, and, to the extent such FTG Equity Interests are held by DTC, based upon the records of DTC.  The Plan Administrator shall be authorized to rely on the Debtors' books and records, including information provided by the Debtors' transfer agent and DTC, to determine the identity of Holders and the amount of their Allowed FTG Equity Interests.  Distributions to registered Holders of Allowed FTG Equity Interests shall be made to the addresses reflected in the Debtors' stock ledger maintained by their transfer agent, unless such Holder provides updated delivery instructions to the Plan Administrator in writing.  Distributions to beneficial Holders of Allowed FTG Equity Interests held in "street name" through DTC shall be made through DTC in accordance with

customary practices.  The Plan Administrator shall coordinate with DTC and its participants to facilitate the delivery of Distributions to such Holders of Allowed FTG Equity Interests.

**B.      Delivery of Distributions and Undeliverable or Unclaimed Distributions**

1.      <u>Distributions Generally</u>

Except as otherwise provided in the Plan, the Plan Administrator shall make distributions to Holders of Allowed Claims and Allowed Interests at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any filed Proof of Claim.

2.      <u>Distributions on Account of Obligations of Multiple Debtors</u>

For all purposes associated with distributions under the Plan, any obligation that could be asserted against more than one Debtor shall result in a single distribution under the Plan.  Any such Claims shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

3.      <u>Record Date of Distributions</u>

On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests.  The applicable Debtors, Liquidating Debtors, and Plan Administrator shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.  In addition, with respect to payment of any Cure Claim or disputes over any Cure Claim, neither the Debtors, the Liquidating Debtors, nor the Plan Administrator shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Cure Claim.

4.      <u>Minimum Distributions</u>

The Plan Administrator shall not make any Cash distributions to any Holder of an Allowed Claim or Interest pursuant to this Plan on account of such Allowed Claim or Interest if such distribution is valued, in the reasonable discretion of the Plan Administrator, at less than $50.00, and each Holder of an Allowed Claim or Interest to which this limitation applies shall not be entitled to any distributions under the Plan.

5.      <u>Undeliverable and Unclaimed Distributions</u>

No distribution to Holders of Allowed Claims or Interests shall be made unless and until the Plan Administrator has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided, however*, that Unclaimed Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the earlier of (a) ninety (90) days after the applicable Distribution Date

63

or (b) one year after the Effective Date.  Any check (or other form of distribution) issued on account of an Allowed Claim or Allowed Interest that is not negotiated within ninety (90) days from and after the date of issuance thereof shall be deemed an Unclaimed Distribution.  After such date, (i) all unclaimed property shall revert to the Liquidating Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary) for distribution to Holders of unsatisfied Allowed Claims and Interests, and (ii) all other such unclaimed property or interests in property shall revert to the Liquidating Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder or its successors with respect to such property or interest in property shall not be entitled to any distributions under the Plan and shall be deemed forever barred from asserting such Claim or Interest against the Liquidating Debtors, the Plan Administrator, or any property of the foregoing.

6.      Manner of Payment Pursuant to the Plan

At the option of the Plan Administrator, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, or as otherwise provided in applicable agreements.

C.      **Withholding and Reporting Requirements; Compliance Matters**

In connection with the Plan, the Debtors, the Liquidating Debtors, or the Plan Administrator, as applicable, and any other applicable withholding and reporting agents, shall comply with all tax withholding and reporting requirements lawfully imposed on them by any Governmental Unit, including related interest, penalties, inflation adjustments, and fees (if any) and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors, the Liquidating Debtors, and the Plan Administrator, as applicable, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements; *provided, however*, that Debtors, the Liquidating Debtors, or the Plan Administrator, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond.  The Debtors, the Liquidating Debtors, or the Plan Administrator, as applicable, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.  At the reasonable discretion of the Liquidating Debtors or the Plan Administrator, no distribution shall be made to or on behalf of such Holder of a Claim or Interest pursuant to this Plan unless and until such Holder of a Claim or Interest has made arrangements satisfactory to the Liquidating Debtors and the Plan Administrator for the payment and satisfaction of such tax obligations, and any Cash or other consideration or property to be distributed pursuant to this Plan shall, pending the implementation of arrangements pursuant to the previous clause, be treated as an Unclaimed Distribution, which shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date.  After such date, all such unclaimed property or interests in property shall revert to the Liquidating Debtors automatically and without need for a further order by the Bankruptcy

64

Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan. Notwithstanding any other provision of this Plan to the contrary, (a) each Holder of a Claim or Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution, and (b) any amounts deducted or withheld from any distribution to a Holder by the Liquidating Debtors or the Plan Administrator in respect of any tax shall be treated as if distributed to such Holder in connection with satisfaction of such Holder's Claim or Interest.

**D.    Claims or Interests Paid or Payable by Third Parties**

1.    Claims or Interests Paid by Third Parties

The Debtors, the Liquidating Debtors, or the Plan Administrator, as applicable, shall reduce a Claim or Interest, and such Claim or Interest (or portion thereof) shall be Disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim or Interest receives a payment on account of such Claim or Interest from a party that is not the Debtors, the Liquidating Debtors, or the Plan Administrator, as applicable. To the extent a Holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not the Debtors, the Liquidating Debtors, or the Plan Administrator, as applicable, on account of such Claim or Interest, such Holder shall, within ten (10) Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the Plan Administrator to the extent the Holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan. The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the Liquidating Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten (10) Business Day grace period specified above until the amount is repaid.

2.    Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is an Insured Claim until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then, immediately upon such payment, such Claim may be expunged or reduced on the Claims Register by the Claims Agent to the extent of any such payment without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies

Except as otherwise provided herein, payments made to Holders of Claims shall be made in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the

65

Plan or the Confirmation Order shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, claims, defenses, or Cause of Action that the Debtors, or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable Insurance Policies, agreements related thereto, and applicable non-bankruptcy law.

**E.      Setoffs and Recoupment**

Except as otherwise expressly provided for herein, each Debtor or Liquidating Debtor, as applicable, or such Entity's designee as instructed by such Debtor or Liquidating Debtors, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any claims, rights, and Causes of Action of any nature whatsoever that the Debtors or Liquidating Debtors, as applicable, may have against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise).  Notwithstanding the foregoing, except as expressly stated in Article X hereof, neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Liquidating Debtors of any such claims, rights, or Causes of Action against such Holder.  In no event shall any Holder of Claims be entitled to set off any Claim against any claim, right, or Cause of Action of the Debtors or Liquidating Debtors, as applicable, unless such Holder (i) has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, or (ii) has agreed with the Debtors on or before the Confirmation Date that such Holder's setoff rights are preserved, *provided*, that no such Holder shall be entitled to set off any Claim absent agreement with the Debtors, Liquidating Debtors, or Plan Administrator or further order of the Bankruptcy Court.

**F.      Foreign Currency Exchange Rate**

Except as otherwise provided in a Final Order of the Bankruptcy Court, as of the Effective Date, any Claim asserted in a government-issued currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Petition Date.

**ARTICLE VIII**
**PROCEDURES FOR DISPUTED CLAIMS AND INTERESTS**

**A.      Objections to Claims**

As of the Effective Date, objections to, and requests for estimation of, Claims (other than Professional Claims) against the Debtors may be interposed and prosecuted by the Liquidating Debtors or Plan Administrator.  Such objections and requests for estimation shall be served and

Filed on or before the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable.

**B.      Allowance of Claims; Settlement or Compromise**

After the Effective Date, each of the Liquidating Debtors and the Plan Administrator shall have and retain any and all rights, claims, Causes of Action and defenses that the Debtors had with respect to any Claim against a Debtor, except with respect to any Claim deemed Allowed under this Plan, except as to any right, claim, Cause of Action or defense that constitutes a Purchased Asset under the Ferring APA and other Sale Transaction Documents.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.  Following the Effective Date, the Liquidating Debtors and the Plan Administrator shall have the exclusive right to settle or compromise all Claims (including Administrative Claims).

**C.      Estimation of Claims**

The Debtors, Liquidating Debtors, or Plan Administrator, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any party in interest previously objected thereto or whether the Bankruptcy Court has ruled on any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or the maximum limit of such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or Liquidating Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**D.      Elimination of Duplicate Claims**

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, upon stipulation between the parties in interest without a Claims objection having to be Filed and without any further notice or action, order, or approval of the Bankruptcy Court.  If a Claim has been satisfied, the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, may amend the Claims Register indicating that such Claim has been satisfied.

**E.      No Distributions Pending Allowance**

Notwithstanding any other provision of this Plan to the contrary, no payment or distributions of any kind or nature provided under the Plan shall be made with respect to all or any

portion of a Disputed Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest or has otherwise been resolved by settlement or Final Order; *provided, however*, that, if the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Interest, the Plan Administrator may make a partial distribution on account of that portion of such Claim or Interest that is not Disputed at the time and in the manner that the Plan Administrator makes distributions to similarly situated Holders of Allowed Claims or Interests pursuant to the Plan.

**F.      Distributions After Allowance**

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing a Disputed Claim or Interest becomes a Final Order, the Plan Administrator shall provide to the Holder of such Allowed Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Allowed Claim or Interest unless required under applicable bankruptcy law.

**G.      No Postpetition Interest**

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim, notwithstanding any dispute or other delay with respect to any distribution.  For the avoidance of doubt, Holders of Allowed Other Secured Claims in Class 1, Allowed Other Priority Claims in Class 2, and Allowed General Unsecured Claims in Class 3 shall be entitled to receive postpetition interest under the Plan to the extent set forth in Article V.F.1, Article V.F.2, and Article V.F.3 hereof, respectively.

**H.      Resolution of Claims**

Except as otherwise provided herein (including the release and exculpation provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Liquidating Debtors and Plan Administrator may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, disputed claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or Liquidating Debtors, as applicable, may hold against any Entity, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.  From and after the Effective Date, the Liquidating Debtors and Plan Administrator may settle or compromise any Disputed Claim or Disputed Interest without approval of the Bankruptcy Court.

**I.      Disputed Claims Reserve**

On or after the Effective Date, the Liquidating Debtors and Plan Administrator shall be authorized, but not directed, to establish one or more Disputed Claims Reserves for any Disputed

68

Claims or Disputed Interests, which Disputed Claims Reserves shall be administered by the Plan Administrator and Liquidating Debtors.

After the Effective Date, the Liquidating Debtors and Plan Administrator may hold any property to be distributed pursuant to the Plan, in the same proportions and amounts as provided for in the Plan, in the Disputed Claims Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed after the Effective Date.  The Liquidating Debtors or Plan Administrator shall distribute any such amounts or other property (net of any expenses, including taxes related thereto) to Holders of Claims and Interests ultimately determined to be Allowed after the Effective Date in accordance with the terms of the Plan, and such amounts will be distributable on account of such Claims and Interests as such amounts would have been distributable had such Claims or Interests been Allowed as of the Effective Date solely to the extent of the amounts available in the applicable Disputed Claims Reserves.

## J.  Disallowance of Claims and Interests

Any Claims or Interests held by an Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Liquidating Debtors, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN, BY AN ORDER OF THE BANKRUPTCY COURT, OR AS AGREED TO BY THE DEBTORS, THE LIQUIDATING DEBTORS, OR THE PLAN ADMINISTRATOR, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM OR PROOFS OF INTEREST FILED AFTER THE APPLICABLE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE, AND HOLDERS OF SUCH CLAIM OR INTEREST MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT THEREOF UNLESS SUCH LATE PROOF OF CLAIM OR PROOF OF INTEREST HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

## K.  Amendments to Claims and Late Filed Claims

Following the Effective Date, except as otherwise provided in this Plan or the Confirmation Order, as applicable, no Proof of Claim or Proof of Interest may be Filed, amended, or supplemented without the approval of the Bankruptcy Court or without the prior written authorization of the Liquidating Debtors or Plan Administrator, as applicable.

## L.  Single Satisfaction of Claims

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims.  Notwithstanding the foregoing, in no case shall the aggregate value of all property

received or retained under the Plan on account of any Allowed Claim exceed one hundred (100) percent of the underlying Allowed Claim.

## ARTICLE IX
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.     Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except for those Assigned Executory Contracts and Unexpired Leases as set forth in the Ferring APA and Sale Transaction Documents, all Executory Contracts or Unexpired Leases shall be deemed rejected by the applicable Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts and Unexpired Leases that: (i) have been previously assumed, assumed and assigned, or rejected by a Final Order;[8] (ii) are the subject of a motion to assume Executory Contracts or Unexpired Leases that is pending on the Effective Date; (iii) the Debtors have, as of the Effective Date, received authority to assume pursuant to an order of the Bankruptcy Court and the effective date of such assumption is after the Effective Date; (iv) are listed on the Schedule of Assumed and Retained Contracts and Leases and are not removed from such schedule at the option of the Debtors prior to the Effective Date; and (v) provide for payment of severance or other benefits to former employees of the Debtors whether in the form of a plan or individual agreement; *provided*, that nothing in the Plan or Confirmation Order shall constitute an admission or finding that any plan or agreement referenced in the immediately preceding clauses constitutes an Executory Contract or Unexpired Lease; and *provided further*, that the Debtors, Liquidating Debtors, and Plan Administrator, as applicable, reserve the right to seek enforcement of or other relief with respect to an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including but not limited to seeking an order of the Bankruptcy Court for the rejection of such Executory Contract or Unexpired Lease for cause.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court (i) approving the assumption and assignment to the Ferring Purchaser of the Assigned Executory Contracts and Unexpired Leases, (ii) approving the assumption of the Executory Contracts and Unexpired Leases set forth on the Schedule of Assumed and Retained Contracts and Leases, and (iii) the rejection of all other Executory Contracts and Unexpired Leases, as applicable, pursuant to sections 365 and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions, assumptions and assignments, and rejections of Executory Contracts and Unexpired Leases pursuant to the Plan and the Sale Transaction Documents, as applicable, are effective (i) as of the Effective Date or (ii) with respect to Assigned Executory Contracts and Unexpired Leases as set forth in the Ferring APA and Sale Transaction Documents, as of the date of closing of the Sale Transaction.  The Debtors, Liquidating Debtors, and Plan Administrator, as applicable, are authorized to abandon any of the Debtors' personal property at or on the leased premises subject to an Unexpired Lease rejected pursuant to the Plan, and the counterparties to rejected leases may dispose of any such personal property remaining at or on the leased premises following the applicable lease rejection date.

---

[8]     For the avoidance of doubt, the Lease with Hood Park was rejected by Final Order effective as of March 31, 2026.

Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to the Ferring Purchaser under the Sale Transaction Documents or a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Liquidating Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law (in each case, in accordance with applicable law, including by consent of the counterparty to such Executory Contract or Unexpired Lease). Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Liquidating Debtors or Plan Administrator, as applicable, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date. To the maximum extent permitted by applicable Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts, conditions or prevents, or purports to restrict, condition or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "anti-assignment," "change of control," consent right, or similar provision), then such provision shall be deemed modified such that the transaction contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. The consummation of the Plan and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control," "change in control," or other similar event under any lease, contract, or agreement to which a Debtor is a party.

## B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of twenty-five (25) days from (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, or (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Liquidating Debtors, the Estates, the Plan Administrator, or property of the foregoing parties, without the need for any objection by the Debtors, the Liquidating Debtors, or the Plan Administrator, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary**. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article V.F.3 hereof, and such Claims may be objected to in accordance with this Plan.

71

**C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

With respect to Assigned Executory Contracts and Unexpired Leases, the Ferring Purchaser shall pay Cure Claims on the date of closing of the Sale Transaction or as soon as reasonably practicable thereafter, or on such other terms as the parties to such Assigned Executory Contracts or Unexpired Leases may otherwise agree with the Ferring Purchaser. For any additional Executory Contracts and Unexpired Leases set forth on the Schedule of Assumed and Retained Contracts and Leases, the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, shall pay Cure Claims, if any, that are not subject to an Assumption Dispute on the Effective Date, or to the extent necessary, on the later of the Effective Date (or as soon as reasonably practicable thereafter), as such amounts would otherwise come due in the ordinary course of business, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. The Liquidating Debtors and Plan Administrator may settle any Cure Claims on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365 of the Bankruptcy Code by payment in Cash of the Cure Claim in the amounts set forth on the Cure Notice for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Ferring Purchaser, Debtors, Liquidating Debtors, or Plan Administrator, as applicable, may otherwise agree or as determined by the Bankruptcy Court by a Final Order. Any Cure Claims shall be deemed fully satisfied, released, and discharged upon payment of such Cure Claims by the Ferring Purchaser, Debtors, Liquidating Debtors, or Plan Administrator, as applicable.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, subject to the payment of the applicable Cure Claims, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assumed and assigned Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court upon payment of the applicable Cure Claims.

**D.      Assumption Dispute Resolution**

In the event of a timely Filed objection regarding: (i) the amount of any Cure Claims (which objection deadline, for the avoidance of doubt, was May 11, 2026 at 4:00 p.m. (prevailing Eastern Time) as provided in the Cure Notice and Bidding Procedures Order); (ii) the ability of the Liquidating Debtors, Ferring Purchaser, or any other assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or payment of a Cure Claim required by section 365(b)(1) of the Bankruptcy Code, such dispute (an "Assumption Dispute") shall be resolved by a Final Order of the Bankruptcy

Court (which may be the Confirmation Order) or as may be agreed upon by the Ferring Purchaser, the Debtors, the Liquidating Debtors, or the Plan Administrator, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; *provided*, that the Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty or counterparties to such Executory Contract or Unexpired Lease, and *provided further* that the Bankruptcy Court shall have the authority to hear any disputes regarding such reserve. To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtors, the Debtors may reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect the earlier assumption and/or assumption and assignment.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing.

### E. Pre-Existing Payment and Other Obligations

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Liquidating Debtors, as applicable, under such contract or lease. In particular, notwithstanding any applicable non-bankruptcy law to the contrary, the Plan Administrator and Liquidating Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide payment to the contracting Debtors or Liquidating Debtors, as applicable, of outstanding and future amounts owing thereto under or in connection with rejected Executory Contracts or Unexpired Leases.

### F. Indemnification Obligations

Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, unless such obligation (i) was rejected by the Debtors pursuant to a Final Order or (ii) is the subject of a motion to reject that is pending as of the Effective Date. Each Indemnification Obligation assumed by the applicable Debtor shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

### G. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other

73

interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**H.      Reservation of Rights**

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, the Schedule of Assumed and Retained Contracts and Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Liquidating Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, assumption and assignment, or rejection, the Debtors, or, after the Effective Date, the Liquidating Debtors or Plan Administrator, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  For the avoidance of doubt, the Debtors, Liquidating Debtors, and Plan Administrator reserve all rights with respect to any Retained Causes of Action or other right with respect to any Executory Contract or Unexpired Lease.

### ARTICLE X
### SETTLEMENT, RELEASES, INJUNCTIONS, AND RELATED PROVISIONS

**A.      Compromise and Settlement of Claims, Interests, and Controversies**

In accordance with the provisions of the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Plan Administrator and Liquidating Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

**B.      Release of Liens**

Except (i) with respect to the Liens securing Allowed Other Secured Claims that are Reinstated under the Plan, or (ii) as otherwise provided in the Plan or in any Definitive Document, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised.

**C.      Satisfaction of Claims and Termination of Interests**

Pursuant to sections 105 and 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in respect of, the Debtors or any of their Assets or properties,

74

regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, any Claims for withdrawal liability that relate to services performed by employees of any Debtor before the Effective Date or that arise from a termination of employment, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept or reject the Plan.  Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.

**D.      Term of Injunctions or Stays**

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

**E.      Releases by the Debtors**

**Notwithstanding anything in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released by each of the Debtors, their respective Estates, and any Person seeking to exercise the rights of any of the Debtors or their Estates (including any successors to any of the Debtors or their Estates or any estate representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), in each case, on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons who may purport to assert any claim or Cause of Action, derivatively, by, through, for, or because of any of the foregoing Persons, from any and all claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise, that any of the Debtors, the Liquidating Debtors, their respective Estates, or any successors to or representatives of the foregoing appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, including the Plan Administrator, would have been legally entitled to assert in their own right (whether individually or collectively) or that any Holder of any Claim against or any Interest in, any of the Debtors could have asserted on behalf of any of the Debtors, the Liquidating Debtors, or their respective Estates, based on, relating to, or in any manner arising from, in whole or in part, any of the Debtors (including the capital structure, management, ownership, or operations thereof), any Security of any of the Debtors, the subject matter of, or the transactions or events giving rise to, any such claim or Cause of Action, the business or contractual arrangements between any Debtor and a Released Party, any of the Debtors' restructuring efforts, any intercompany transactions**

**performed by any of the Debtors, the Chapter 11 Cases (including the Filing thereof and any relief obtained by the Debtors therein), the formulation, preparation, dissemination, negotiation, or Filing of the Combined Disclosure Statement and Plan (including, for the avoidance of any doubt, the Plan Supplement), the Bidding Procedures Order (and the procedures approved thereby), the Sale Transaction Documents, any Definitive Document, or any other contract, instrument, release, or other agreement or document (including any legal opinion requested by any Person regarding any transaction, contract, instrument, document or other agreement contemplated by the Combined Disclosure Statement and Plan or the reliance by any Released Party on the Combined Disclosure Statement and Plan or the Confirmation Order with respect to the Combined Disclosure Statement and Plan in lieu of such legal opinion) created or entered into, whether before or during the Chapter 11 Cases, in connection with the Filing of the Debtors' Chapter 11 Cases, the Bidding Procedures Order, the Combined Disclosure Statement and Plan (including, for the avoidance of any doubt, the Plan Supplement), the Sale Transaction and any other Restructuring Transactions, any other Definitive Document, the solicitation of votes with respect to the Plan, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, and the administration and the implementation of the Plan, including the issuance or distribution of property pursuant to the Plan, or any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date other than claims or Causes of Action resulting therefrom arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, in each case, solely to the extent determined by a Final Order.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date Claims or obligations of any Person under the Plan, the Confirmation Order with respect to the Plan, the Sale Transaction or any other Restructuring Transactions, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Claims or obligations of any Person arising under the Sale Transaction Documents, or (c) any right of objection, defense, mandatory counterclaim, or right of setoff to any Claim against or Interest in the Debtors.**

F.      **Third Party Releases**

**Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released by each Releasing Party from any and all claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, any of the Debtors (including the capital structure, management, ownership, or operation thereof), any security of any of the Debtors or the Liquidating Debtors, the subject matter of, or the transactions or events giving rise to, any Claim that is**

76

**treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against any of the Debtors, the Debtors' in-or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Chapter 11 Cases, the Bidding Procedures, the Bidding Procedures Order, the Combined Disclosure Statement and Plan (including, for the avoidance of any doubt, the Plan Supplement), any other Definitive Document, the Sale Transaction and any other Restructuring Transactions, any contract, instrument, release, or other agreement or document created or entered into, whether before or during the Chapter 11 Cases, in connection with the Filing of the Debtors' Chapter 11 Cases, the Bidding Procedures, the Bidding Procedures Order, the Combined Disclosure Statement and Plan (including, for the avoidance of any doubt, the Plan Supplement), any other Definitive Document, the Sale Transaction and any other Restructuring Transactions, the solicitation of votes with respect to the Plan, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, and the administration and implementation of the Plan. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this <u>Article X.F</u> shall not be construed as: (i) releasing any Released Party from claims and Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; (ii) releasing any post-Effective Date obligations of or under (A) any party or Entity under the Plan, (B) any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order, or (C) any document, instrument, or agreement executed to implement the Plan; (iii) releasing any obligations arising under the Sale Transaction Documents; (iv) releasing any rights to distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order; or (v) releasing or discharging any properly-pled direct claim (other than claims against the Debtors) held by a creditor that is not a Releasing Party.**

G.     **Exculpation**

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on, without limitation, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Bidding Procedures, the Bidding Procedures Order, the Combined Disclosure Statement and Plan (including, for the avoidance of any doubt, the Plan Supplement), any other Definitive Document, the Sale Transaction and any other Restructuring Transactions, any contract, instrument, release, or other agreement or document created or entered into, without limitation, in connection with the Bidding Procedures, the Bidding Procedures Order, the Combined Disclosure Statement and Plan (including, for the avoidance of any doubt, the Plan Supplement), any other Definitive Document, the Sale Transaction and any other Restructuring Transactions, the filing of the Chapter 11 Cases, the administration of the Claims reconciliation process, the implementation of orders of the Bankruptcy Court entered during the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the administration of the**

77

**Chapter 11 Cases, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

## H.    Injunction

1.    Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, members, managers, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan in relation to any Claim, Interest or Cause of Action extinguished or released pursuant to the Plan and are enjoined from interfering with the Debtors', Liquidating Debtors', or Plan Administrator's, as applicable, administration of the Retained Causes of Action and may not take any action to interfere with the Sale Transaction or any other Restructuring Transaction.

2.    Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a Holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether or not proof of such Claims or Interests has been Filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, members, managers, agents, officers, directors, principals, and affiliates are enjoined, on and after the Effective Date through and until the date upon which all remaining property of the Debtors' Estates vested in the Liquidating Debtors has been liquidated and distributed to creditors or otherwise in accordance with the terms of the Plan and the Plan Administrator Agreement and the Plan has been fully administered, subject to further extension or reduction by motion on notice, with all parties' rights with respect to such extension or reduction reserved, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, or released pursuant to the Plan from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Liquidating Debtors, the Plan Administrator, or the property of any of the Debtors, the Liquidating Debtors, or their respective Estates, or the Plan Administrator, as applicable; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Liquidating Debtors, the Plan Administrator, or the property of any of the Debtors, the Liquidating Debtors or the Plan Administrator, as applicable; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Liquidating Debtors, the Plan Administrator, or the property of any of the Debtors, the Liquidating Debtors, or their respective Estates, or the Plan Administrator, as applicable; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, the Liquidating Debtors, or the Plan Administrator, as applicable, or against property or interests in property of any of the Debtors, the Liquidating Debtors, or the Plan Administrator, as applicable, except as contemplated or

allowed by the Plan, and except to the extent a setoff is asserted in a Filed proof of Claim or by way of a motion Filed prior to the confirmation of the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

3.      The injunctions in this Article X shall extend to any successors of the Debtors or the Liquidating Debtors, as applicable, including the Plan Administrator, and their respective property and interests in property.

**I.      Securities and Exchange Commission**

Notwithstanding any language to the contrary herein, no provision shall: (i) preclude the SEC from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

**J.      Protection Against Discriminatory Treatment**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Liquidating Debtor, or any Entity with which a Liquidating Debtor has been or is associated, solely because such Liquidating Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## ARTICLE XI
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**A.      Conditions Precedent to the Effective Date**

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

1.      the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance reasonably acceptable to the Debtors, which shall:

> (a)      approve the adequacy of the Disclosure Statement on a final basis;

> (b)      authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan in a manner consistent in all respects with the Ferring APA, other Sale Transaction Documents, and Definitive Documents and subject to the consent rights set forth herein and therein;

> (c)      decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

(d)   authorize the Debtors, Liquidating Debtors, and Plan Administrator, as applicable/necessary, to: (i) implement the Restructuring Transactions and consummate the Sale Transaction; and (ii) make all distributions and issuances as required under the Plan;

(e)   authorize the implementation of the Plan in accordance with its terms, including, without limitation, directing all necessary parties required to consummate the Sale Transaction and other Restructuring Transactions under applicable Law; and

(f)   provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan and the Sale Transaction Documents, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan and the Sale Transaction Documents, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax, to the extent permissible under applicable Law;

2.   the Ferring APA shall remain in full force and effect and shall not have been terminated at any time;

3.   the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

4.   the final version of each of the Plan, the Definitive Documents, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Plan, and shall not have been modified without the consent of the Debtors;

5.   all Professional Claims that, as of the Effective Date, were due and payable under an order of the Bankruptcy Court shall have been paid in full, other than any Professional Claims subject to approval by the Bankruptcy Court after the Effective Date;

6.   the Debtors shall have funded the Professional Claims Escrow Account in accordance with Article IV.C.4 hereof;

7.   all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan as of the Effective Date shall have been received, waived or otherwise resolved; and

8.   all documents and agreements necessary to implement the Plan and the Sale Transaction, including those set forth in the Plan Supplement, shall have (i) been tendered for delivery and (ii) been effectuated or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

**B.      Waiver of Conditions Precedent**

Each of the conditions precedent in this Article XI may be waived by the Debtors.  Any such waivers may be effectuated at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

**C.      Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**D.      Effect of Vacatur of Confirmation Order**

If the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Debtors and all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise; provided, however, that any reversal or modification on appeal of the Confirmation Order after the closing of the Sale Transaction shall not affect the validity of the Sale Transaction.

## ARTICLE XII
## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, to:

1.      hear and determine motions and/or applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

2.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (iii) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

3.      determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date, including any such motion, adversary proceeding, application, contested matter, or other litigated matter brought by the Plan Administrator or Liquidating Debtors;

81

4.        ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished as provided herein;

5.        consider Claims or the allowance, classification, priority, compromise, estimation or payment of or objection to any Claim;

6.        enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

7.        issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to (a) restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, the Confirmation Order, the Sale Transaction, or any other order of the Bankruptcy Court and (b) direct any necessary party to take all such actions required to consummate the Plan, including the execution of documents required by applicable law to release liens, encumbrances, and Interests;

8.        hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

9.        hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Effective Date;

10.        hear and determine disputes, including regulatory disputes, arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the Sale Transaction Documents, or any agreement, instrument, or other document governing or relating to any of the foregoing;

11.        take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following Consummation, including directing any necessary party to act in furtherance of consummating the Plan;

12.        determine such other matters and for such other purposes as may be provided in the Confirmation Order;

13.        hear and determine matters concerning state, local, foreign, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

14.        adjudicate any and all disputes arising from or relating to distributions under the Plan;

15.        hear and determine any other matters over which the Bankruptcy Court has jurisdiction;

16.     enter one or more final decrees closing the Chapter 11 Cases;

17.     recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

18.     hear and determine any rights, claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

19.     hear and determine any other matters that may arise in connection with or relate to the Combined Disclosure Statement and Plan, the Plan Supplement, the Disclosure Statement and Solicitation Procedures Order, the Confirmation Order, the Ferring APA and other Sale Transaction Documents, or any contract, instrument, release, indenture, or other agreement or document created in connection therewith;

20.     resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Combined Disclosure Statement and Plan, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to the amount of a cure, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purposes; and

21.     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

### A.     Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Liquidating Debtors or Plan Administrator to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### B.     Amendments

1.     Plan Modifications.  The Plan may be amended, modified or supplemented by the Debtors prior to the Effective Date, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, the Debtors, Liquidating Debtors, or Plan Administrator, as applicable, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

2.    Other Amendments.  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and any of the documents prepared in connection herewith without further order or approval of the Bankruptcy Court.

## C.    Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (A) constitute a waiver or release of any Claims or Interests; (B) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (C) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

## D.    Severability of Plan Provisions Upon Confirmation

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Liquidating Debtors, or the Plan Administrator, as applicable; and (iii) not severable and mutually dependent.

## E.    Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes to accept or reject the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys, will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of any Securities offered and sold under the Plan, and, therefore, neither any of such parties nor individuals or the Debtors, Liquidating Debtors, or Plan Administrator will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

**F.      Governing Law**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

**G.      Time**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**H.      Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**I.      Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all Holders of Claims or Interests and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**J.      Immediate Binding Effect**

Subject to Article XI hereof and the applicable provisions of the Bankruptcy Code, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon, and inure to the benefit of the Debtors, the Liquidating Debtors, the Plan Administrator, the Holders of Claims and Interests, the Releasing Parties, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns.

**K.      Successors and Assigns**

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

**L.      Entire Agreement**

On the Effective Date, the Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

85

**M.      Notices**

All notices, requests and demands to or upon the Debtors to be effective shall be in writing (including by email but excluding facsimile transmission, which is not permitted) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received, addressed as follows:

Debtors:

Finch Therapeutics Group, Inc., *et al.*
75 State Street, Suite 100
Boston, MA 02109
Attn: Matthew Blischak

Counsel to Debtors:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Attn: Cristine Pirro Schwarzman
Cameron J. Cavalier
Email: cristine.schwarzman@ropesgray.com
cameron.cavalier@ropesgray.com

-and-

Ropes & Gray LLP
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Attn: Chris L. Dickerson
Email: chris.dickerson@ropesgray.com

-and-

Chipman Brown Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0191
Attn:  Robert A. Weber
Email: weber@chipmanbrown.com

-and-

Chipman Brown Cicero & Cole, LLP
420 Lexington Avenue, Suite 442
New York, New York 10170
Telephone: (646) 741-5529
Attn:  Daniel G. Egan

Email: egan@chipmanbrown.com

After the Effective Date, the Entities entitled to receive documents pursuant to Bankruptcy Rule 2002 shall be limited to those Entities: (i) who have Filed renewed requests and to those Entities who are required to be served under Local Rule 2002-1(b) and/or (ii) whose rights are affected by such documents.

**ARTICLE XIV**
**CERTAIN UNITED STATES FEDERAL**
**INCOME TAX CONSEQUENCES OF THE PLAN**

**THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN TO THE DEBTORS AND TO U.S. HOLDERS OF ALLOWED FTG EQUITY INTERESTS. THIS DISCUSSION DOES NOT ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO (I) CREDITORS WHOSE CLAIMS ARE UNIMPAIRED OR OTHERWISE ENTITLED TO PAYMENT IN FULL IN CASH UNDER THE COMBINED DISCLOSURE STATEMENT AND PLAN OR (II) HOLDERS WHO ARE DEEMED TO REJECT THE COMBINED DISCLOSURE STATEMENT AND PLAN.**

The discussion of U.S. federal income tax consequences below is based on the U.S. Internal Revenue Code of 1986, as amended from time to time (the "Tax Code"), Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("IRS"), and other applicable authorities, all as in effect on the date of this Combined Disclosure Statement and Plan and all of which are subject to change or differing interpretations, possibly with retroactive effect. The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. No assurance can be given that the IRS will not take a position contrary to the description of U.S. federal income tax consequences of the Plan described below.

This discussion does not address non-U.S., state, or local tax consequences of the Combined Disclosure Statement and Plan, nor does it purport to address the U.S. federal income tax consequences of the Combined Disclosure Statement and Plan to special classes of taxpayers (including foreign taxpayers), small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold Allowed FTG Equity Interests through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on unearned income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Allowed FTG Equity Interests that are part of a straddle, hedging, constructive sale, or conversion transaction. In addition, this discussion

does not address U.S. federal taxes other than income taxes, nor does it address the Foreign Account Tax Compliance Act.  Holders not described herein should consult their own tax advisors regarding the U.S. federal, state, local, and foreign tax consequences of the Combined Disclosure Statement and Plan.

The following discussion generally assumes that the Combined Disclosure Statement and Plan implements the liquidation of the Debtors for U.S. federal income tax purposes and that all distributions by the Debtors will be taxed accordingly.  Additionally, this discussion assumes that (i) the various arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form and (ii) except if otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code.

For purposes of this discussion, the term "U.S. Holder" means a beneficial owner of an Allowed FTG Equity Interest that is, for U.S. federal income tax purposes: (i) an individual who is a citizen or resident of the United States; (ii) a corporation, or other entity taxable as a corporation, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust if (a) a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. persons have the authority to control all of its substantial decisions, or (b) such trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person for U.S. federal income tax purposes.  If an entity classified as a partnership for U.S. federal income tax purposes holds an Allowed FTG Equity Interest, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership, and such partner should consult its own tax advisor.

**THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON YOUR INDIVIDUAL CIRCUMSTANCES.  EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE U.S. FEDERAL, STATE, PROVINCIAL, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE COMBINED DISCLOSURE STATEMENT AND PLAN.**

A.      **Consequences to the Debtors**

The Sale Transaction is expected to give rise to taxable income for the Debtors.  The Debtors cannot guarantee that they have sufficient tax attributes, including net operating losses ("NOLs"), to avoid having a material Cash liability for federal income taxes, as this will depend, in part, on whether any Debtor has undergone (or will subsequently undergo) one or more "ownership changes" under section 382 of the Tax Code prior to the consummation of the Sale Transaction, and other factors and limitations (e.g., the deductibility of NOLs incurred in taxable years beginning after 2017 is generally limited to 80% of the taxpayer's taxable income for a particular tax year).  To the extent any federal income tax liability arises in connection with the Sale Transaction, recoveries to Holders of Allowed FTG Equity Interests would be reduced.

Under the Tax Code, a taxpayer generally recognizes cancellation of debt income ("CODI") to the extent that indebtedness of the taxpayer is satisfied for less than the amount owed by the taxpayer, subject to certain exceptions. The most significant of these exceptions with respect to the Debtors is that taxpayers who are operating under the jurisdiction of a federal bankruptcy court are not required to include CODI with respect to any indebtedness that is discharged pursuant to that federal bankruptcy proceeding (the "Bankruptcy Exception"). If the Bankruptcy Exception applies, however, the taxpayer must reduce its tax attributes, such as its NOLs, general business credits, capital loss carryforwards, and tax basis in assets, by the amount of the CODI avoided. The Debtors do not expect to recognize any material CODI from the implementation of this Combined Disclosure Statement and Plan because all Allowed Claims will be paid in full. The liquidation of the Debtors would eliminate any remaining tax attributes.

## B.       Consequences to U.S. Holders of Allowed FTG Equity Interests

Under this Combined Disclosure Statement and Plan, each Holder of an Allowed FTG Equity Interest will receive Cash in exchange for the cancellation of such Allowed FTG Equity Interest (the "Exchange"). It is expected that the Exchange will be treated as a taxable exchange for U.S. federal income tax purposes, and the discussion below assumes that the Exchange will be treated as a taxable exchange. A Holder of an Allowed FTG Equity Interest generally will recognize gain or loss equal to the difference between (i) the amount of Cash received in exchange for such Allowed FTG Equity Interest and (ii) the U.S. Holder's adjusted tax basis in such Allowed FTG Equity Interest. Such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder held the Allowed FTG Equity Interest for more than one year under applicable tax law. Long-term capital gains of non-corporate U.S. Holders (including individuals) are generally eligible for preferential rates of U.S. federal income taxation. The deductibility of capital losses is subject to certain limitations under the Tax Code. Each Holder of an Allowed FTG Equity Interest should consult their tax advisor regarding the U.S. federal income tax treatment of the Exchange, including the timing and character of gain or loss, pursuant to this Combined Disclosure Statement and Plan.

## C.       Matters Related to the Disputed Claims Reserve

The Debtors may create a Disputed Claims Reserve. It is possible the Debtors will treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulations section 1.468B-9 (and make any appropriate elections) and such treatment may also apply to the extent possible for state and local tax purposes. In general, a "disputed ownership fund" is treated as a separate taxable entity for U.S. federal income tax purposes and is subject to tax annually on any net income earned with respect to the assets allocable thereto, or retained on account thereof (including any gain recognized upon the disposition of such assets). If the Disputed Claims Reserve is treated as a "disputed ownership fund", (i) a separate federal income tax return would be filed with the IRS for the Disputed Claims Reserve with respect to any income attributable to the account, (ii) any taxes imposed on the Disputed Claims Reserve or its assets shall be paid out of the assets of the Disputed Claims Reserve, and (iii) any distributions (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) from the Disputed Claims Reserve to Holders of Allowed Claims will be treated for U.S. federal income tax purposes as if received directly from the Debtors on their Allowed Claim. All parties

(including, without limitation, the Debtors and the Holders of Allowed Claims) will be required to report for tax purposes consistently with the foregoing.

### D.    Information Reporting and Backup Withholding

Information reporting requirements may apply to distributions under this Combined Disclosure Statement and Plan.  Additionally, under the backup withholding rules, a U.S. Holder of an Allowed FTG Equity Interest may be subject to backup withholding (currently at a rate of 24%) with respect to distributions made pursuant to this Combined Disclosure Statement and Plan unless that U.S. Holder timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the U.S. Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9), or otherwise establishes an exemption from backup withholding.  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

The Debtors, Liquidating Debtors, or Plan Administrator will withhold all amounts required by law to be withheld and comply with all applicable information reporting requirements.

### E.    Exemption from Certain Taxes

As set forth in Article VI.O hereof, to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax, recording tax, transfer tax, or other similar tax or governmental assessment.

### F.    Importance of Obtaining Professional Tax Assistance

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

### ARTICLE XV
### RECOMMENDATION AND CONCLUSION

In the opinion of the Debtors, the Plan is preferable and superior to the alternatives set forth in this Combined Disclosure Statement and Plan.  Therefore, the Debtors recommend that Holders of FTG Equity Interests entitled to vote on the Plan vote to accept the Plan and support Confirmation.

Dated: July 24, 2026

Respectfully submitted,

By:  */s/ Matthew Blischak*
  Name:  Matthew Blischak
  Title:  President and CEO

90

**EXHIBIT A**

**Ferring APA**

**[See Docket No. 281]**

**<u>EXHIBIT B</u>**

**Liquidation Analysis**

**[See Docket No. 275]**